hDREW, Judge.
From the judgment awarding the contractor, Lee Underwood, $33,000 pursuant to a land-clearing contract, the landowner, *170 Benny J. Rollins appealed and claimed that the trial court made erroneous factual findings and incorrectly denied his recon-ventional demand. The plaintiff, Underwood, claimed that Rollins owed him $40,000 (less a credit for $10,000 already paid) for his clearing 40 acres of Rollins’ property at the agreed upon price of $1000 per acre. In his answer and reconventional demand against Underwood, Robins contended that the parties agreed Underwood was to clear a tract for Rollins for the total set price of $25,000. Rollins sought to recover from Underwood $6,812 for the cost of hiring someone to complete the work Underwood allegedly failed to finish for Rollins. For the following reasons, the judgment is affirmed.
TESTIMONY
Stating he had been in the concrete and dirt contracting business since 1966, Underwood testified that clearing land is usually bid in three levels. The first level, which generally is bid for $500 per acre, involves clearing and pushing the brush and stumps into a pile. The second level, bid at approximately $1000 per acre, includes digging a pit to burn and then to bury the cleared vegetation. The third level of land clearing is $1500 per acre and consists of root raking a tract totally clean and ready for grass seed. The plaintiff stated that his bids varied more or less per acre depending on the condition of the property to be cleared. When Rollins called, Underwood and his son went to look at the tract. The plaintiff stated that heavy equipment including a shear designed to cut trees off level with the ^ground had been used previously on the property. Underwood declared that Rollins showed him which trees he wanted saved and set out the area to be cleared. Rollins informed Underwood that area was about 25 acres.
Underwood testified that Rollins wanted the second level of clearing which involved digging a pit for the debris, burning the debris and then covering with dirt anything which did not burn. Their agreement was that Underwood was to clear and put vegetation in a pit, burn it once and then bury it. Underwood was to root rake twice. Underwood made an oral bid of $1200 per acre. In exchange for Underwood reducing his price to $1000 per acre, Rollins agreed to reduce Underwood’s work load by putting his farm tractor and farm hands out there to do all the handwork; i.e., picking up of chunks, roots and debris.
Underwood said he discussed with Rollins that he would begin the work using four tractors for five days and thereafter use two tractors to finish if Rollins agreed to pay Underwood $10,000 after five days work. Rollins paid Underwood the $10,000 after ten days work. After the initial five days, Underwood worked the job with two tractors. Rollins became very angry. Underwood had promised him four tractors for only five days because he had other commitments for his machinery. Because Rollins was so “riled,” Underwood put the other two tractors back on the job after the five days and left them there until the job was completed. The complete job lasted approximately six weeks. Underwood testified that the photos which he placed into evidence were taken two days before he completed the job, because Rollins called him the night before and demanded Underwood | ¡¡leave his property. Underwood informed Rollins that they only had two more days of work and that Underwood was not leaving until the job was complete. Underwood worked two more days and finished the job.
According to Underwood, he began the job by digging a channel type hole across *171 the property so that he could push in cleared vegetation, burn it and bury it. On the third day when neither Underwood nor his son was on the job, Rollins came and demanded that Underwood’s workers fill the hole with dirt and burn the debris. According to Underwood, that changed the job from a Level 2 to a Level 3 job which included burning little piles all over the property and moving unburned debris from one pile to another for more burning. That made the work much more time-consuming.
Underwood testified that Rollins would come to the job site and state the work was just what he wanted and then call Underwood at night to say the work was unacceptable. For the first three weeks of the job, Rollins required Underwood to do a 100% burn which left approximately a truck load of debris which Rollins demanded they then move to the next burn pile. After about three weeks, Rollins began rushing Underwood who informed him they were working sixty hours a week. Underwood testified he did not guarantee a time frame. Further, all he promised was that he would work four tractors the first week and keep two tractors on the job until completion.
Underwood testified that a machine burned approximately 3jé gallons of fuel per hour and that he used 4000 gallons of diesel fuel on the Rollins job so his machinery ran over 1000 hours on that job. He charged $75 an | ¿hour for the big track hoe, $65 per hour for the smaller track hoe and $55 each for the two dozers. Had he charged Rollins by the hour, Underwood testified the bill would have been over $70,000. Underwood paid $3,576.44 for fuel and $15,270.50 for labor on the Rollins project. His equipment rental for the job was % of $11,674.80, the cost of two months rental.
On cross-examination, Underwood testified when he, his son and Rollins drove the property, Underwood questioned the stated amount of 25 acres to be cleared. He requested a plat from Rollins who replied he had one but never supplied it to Underwood. Underwood acknowledged he started the job without knowing the exact acreage to be cleared. Because he was charging by the acre, Underwood explained he did not discuss the discrepancy and did not really care how many acres were to be cleared. The reason Underwood bid by the acre was his opinion that there was more land than 25 acres and his uncertainty of the acreage to be cleared. There was no way he could make a lump sum bid.
Although Underwood gets a written contract 99% of the time, he testified he was impressed with Rollins and did not do so in this case which Underwood stated, in light of this dispute, was wrong. In reviewing the pictures of the cleared property, Underwood testified that the job was finished as far as a land clearing job, but was not finished to the point of discing it for pasture land. According to Underwood, he and Rollins specifically agreed that Rollins’ employees would do all the hand work necessary to get the earth ready for disc-ing. Further, Underwood testified he never prepared land for pasture which required the use of a harrow rake, 1 ^equipment Underwood did not have or use. In responding to questions from the court, Underwood stated that he figured he cleared 37 acres. In Underwood’s view, although he had agreed to clear the land for $1000 per acre, he performed a $1500 per acre clearing job in an attempt to please Rollins.
On rebuttal, Underwood testified that of the 43.65 acres, he and his crew cleared 36.61 acres. Underwood stated he did not disagree with Rollins’ witnesses about the *172 condition of the property after he left, but was emphatic that he performed the work he had agreed to do for Rollins. He noted that Rollins told him not to worry about stumps that were sheared off at or under ground level, since he was going to use a stump grinder on those. Underwood agreed to dispose of the debris above ground and to root rake the property twice. Underwood also testified that he cleared up to all the lines marked for him by Rollins. Stating that Rollins did not fulfill his agreement to use a harrow and men to pick up trash by hand behind Underwood’s work, Underwood explained that he fulfilled his obligations and that Rollins chose to hire others to do that hand work later. In response to further questioning by the court, Underwood stated that instead of seeking to recover $40,000 less the $10,000 payment, he should have sought $36,610, since he cleared 36.61 acres.
Scott Brown testified he worked on the Rollins tract ten or twelve days shearing off trees level with the ground. Rollins and Brown agreed Brown was to shear off trees for $90 per acre and to root rake the property for $65 per hour. The root rake was used to pile up the trees cut by the | (¡shear blade. Rollins told Brown the tract was thirty-five to forty acres. Rollins was dissatisfied and had Brown remove his equipment from the property. Brown billed Rollins for shearing and root raking twenty acres, about $7000, but never received payment. Rollins told Brown he was going to make a pasture and he wanted the trees sheared off level with the ground so that he could bush hog the property. The trees which were sheared off were pushed into a pile. At one point Brown thought, but was not sure, they talked about an approximate $17,000 price in addition to what he had already done to complete the work. Then Rollins requested Brown leave the property. Brown stated one minute Rollins would say the work was fine and the next he would say it was the worst he had ever seen.
Lee Underwood, Jr., testified he worked with his father in the construction business. When they initially looked at the property with Rollins, shearing had been done on the property. Rollins wanted the stumps dug, the vegetation burned and the debris which did not burn, buried. The Underwoods agreed with Rollins they would use four machines the first week and two machines thereafter until completion. Along with his father’s other testimony, Underwood, Jr., confirmed that the reason his father agreed to reduce the bid price of $1200 per acre to $1000 per acre was that Rollins committed to bring his tractor and farm hands for clean up work.
Bennie Rollins testified on cross-examination that his tract contained 43.75 acres. In the business of raising and selling race horses, Rollins was in a hurry to have the land cleared and planted with grass to prevent erosion over the winter months and to provide him needed room for expansion. |7After having the timber cut, Rollins made an agreement with Scott Brown to shear off the property, to pile and burn the debris and to get the land ready for discing with a farm tractor. According to Rollins, shearing involved cutting stumps level with or below the ground where they rotted quickly. Rollins opined this was a cheap way to clear land. Rollins stated Brown’s operator made a mess of the property and then quit Brown’s employment before the job was finished. According to Rollins, Brown’s employee who did shearing quit when the job was about three-quarters done. Rollins stated the work was “pretty well all over” the property.
Rollins drove over the property with Underwood and his son. Rollins stated *173 that Underwood offered to do the job in two weeks for $32,000. Since Rollins had gotten a lower price to do the job from another person, Rollins talked to Underwood who agreed to do the job for $25,000 and be finished in two weeks. According to Rollins, it was absolutely clear about the amount of property, where it was, what was to be done and what condition the property was to be in for $25,000. Rollins said he estimated the amount of acres and did not care how much acreage there was, since he had a set price to clear the property. Rollins testified it was clear to him and everyone that he was clearing the property to make a pasture and to get grass planted.
Rollins became very dissatisfied with the job progress and complained to Underwood. Because the debris piles had so much dirt in them, the piles would not bum properly. Rollins also objected that Underwood put top soil at the bottom of the pits and put red clay which would grow nothing on the top of the holes dug for burning and burying. J^After Underwood left the job, Rollins hired Richard Hobson to get the property ready so a tractor could disc it and seed could be planted. John Fragala also worked on the property. According to Rollins, Underwood left much debris that was too large to be handled by hand. The next contractor picked the debris up with a root rake. Rollins had no problem or complaints about the work done by Hobson and Fragala.
Because time was running out on planting grass, Rollins wanted to recover the over $1700 he paid to disc and plant grass seed, a job he initially planned to do himself. Since Underwood had taken so long, Rollins stated he had to hire someone with large equipment (Regan Aswell had a twenty foot disc as opposed to Rollins’ six foot disc) to get the grass planted in a much shorter time than he could have done with his smaller equipment. Rollins also wanted to be reimbursed because he had to plant over $600 in rye grass seed, a winter grass to hold the soil. Rollins stated he never intended not to pay Underwood for the work he did, but that he would not pay anyone for unsatisfactory work.
On cross-examination, Rollins testified it was undisputed that he had agreed to be responsible for picking up the small debris. He hired the City of Faith to do that work during the month of September. Rollins also wanted to recover $370 for stump removal.
John Fragala testified that he brought his equipment onto the property August 23 and completed it September 9. Rollins explained to him that he wanted the property ready as soon as possible for discing and planting grass. Fragala examined the photos in evidence and stated that some of the debris shown was attached to the ground while other items were not. 19Fragala stated he raked up 35 to 40 piles for burning ranging in size from two to four pick-up trucks. Fragala understood from Hobson that he was working on around 35 acres of property.
Richard Hobson testified that when he initially saw the property there was too much debris for the land to be disced for planting. Rollins informed Hobson he was in a hurry to complete the project. Hob-son subcontracted part of the work to Fra-gala who had a root rake on his dozer. Another operator did some clearing also. Hobson testified he had no problems working with or getting paid by Rollins. Further, Hobson had no information about the type of agreement Rollins had with the person who had worked on the property previously.
Askew, owner of a farm supply store at which Rollins did business, testified he also did custom farm work with his own equip- *174 merit. Askew stated that Rollins informed him that Underwood had agreed to clear the land for $24,000 or $25,000. Rollins had Askew disc, prepare, fertilize and plant the soil. After Fragala cleaned the property so that a disc could be used, Askew began his work on a finished portion while Fragala completed another portion of the property. Initially Rollins and Askew discussed planting Bermuda grass. Since this occurred at the end of August, Askew suggested Rollins plant a mixture of Bermuda and rye grass, because he stated he did not plant Bermuda grass after September 15. Askew’s invoice for this work was dated September 3, 1999.
Employed by Rollins as a farm hand since June 1999, Sam Nalley testified that the agreement between Rollins and Underwood was that the land was to be cleared suitably for discs and harrows and for planting grass,J^since it was to be pasture. Nalley did not hear conversations about prices. He stated that the difference between the piles made by Underwood and Fragala was that the Underwood piles were full of dirt and would not burn while the Fragala piles burned well. During his testimony, the plaintiff, Underwood, specifically denied seeing Nalley on the job and stated Nalley’s testimony was not accurate.
WRITTEN REASONS FOR JUDGMENT
The trial court issued an extensive and well-reasoned opinion which ruled that Underwood and Rollins reached an oral contract. In his pleadings, Rollins urged that the parties agreed Underwood was to clear a certain tract of Rollins’ land for $25,000. The allegation amounted to a judicial confession by Rollins of the contract. La. C.C. art. 1853. Therefore, Underwood met his burden under La. C.C. art. 1846 of proving the existence of an oral contract in excess of $500 by at least one witness and other corroborating circumstances. A contract is formed by the consent of the parties through offer and acceptance and may be verbal. La. C.C. art. 1927. The contract was that Underwood was to do land clearing and that Rollins was to pay Underwood for the work. The trial court noted that these parties disagreed as to specific terms of the contract; i.e., the extent of the work done by Underwood, the exact price and the time for Underwood’s performance.
Underwood testified that land clearing was done in three levels of work. The most basic type cost $500 per acre and was limited to clearing by pushing tree limbs and tops into a pile. Underwood charged $1000 per acre for the second level of clearing which consisted of clearing, piling and Inhuming the debris and digging holes for burying debris which did not burn. The final and most finished type of clearing was the third level for which Underwood charged $1500 per acre. After completing the steps described above the property is thoroughly root raked and cleaned so that the land is suitable to immediately plant grass.
The trial court found that Underwood agreed to clear Rollins’ land to the second level of clearing. After Underwood completed his burn and burial of debris, Rollins’ workers were to come behind and gather the smaller debris. The photos in evidence showed the property had been cleared to the second level, which was to remove visible stumps and brush except for stumps in the pond area. Underwood pushed the debris into piles and agreed to root rake twice to collect larger pieces of vegetation. Underwood agreed to burn the piles once and then bury the items that would not burn. The court found that Underwood lived up to his end of the bargain and even exceeded the scope of *175 the contract by root raking the property four times. Underwood’s testimony was corroborated by that of his son and by the pictures placed into evidence. Also, in his deposition, O.E. Woods stated that when Underwood had done land clearing for him, Woods had completed preparing the land for planting by doing the hand work and using a harrow-type rake for smaller pieces. According to Woods, a bull dozer was not an efficient tool; hand work was required when the dozer work was complete.
Underwood stated the price agreed upon was $1000 per acre which was consistent with the second level of clearing. The trial court rejected Rollins’ contention that the price was an agreed $25,000, since it | ^specifically found it was not reasonable that Underwood would agree to a flat price without knowing how many acres were involved. The trial judge also noted that Rollins could, but did not, provide Underwood the information about exactly how many acres were to be cleared. Relying on the evidence provided as to the amount of fuel used and the hours worked, the trial court found that Underwood’s expenses were over $30,000.
Although undisputed that Rollins wanted the work done as quickly as possible, the trial court also rejected Rollins’ assertions that the work was to be completed in two weeks. Citing Morvant v. Russell & Clemmons, 11 So.2d 45 (La.App. 1st Cir. 1942), the court stated that since there was no fixed completion date, the contract had to be completed in a reasonable time. Further, the trial court found that no specific target date was fixed and that the wooded condition of the tract made it difficult to determine how long the project would take. There was no testimony that Rollins told Underwood what exactly the property was to be used or that Rollins was in the thoroughbred horse business. The trial court also found factually that Rollins did not tell Underwood that he needed the project completed as soon as possible so he could plant grass.
Testimony showed that the usual rate of clearing is one acre per day. Underwood stated he cleared over 36 acres in 32 days while Rollins maintained that 25 acres was cleared. In light of information about a pond area and small creek in the northeast corner, the trial court found that, based on not altogether clear testimony, Underwood cleared 33 acres. The court noted Rollins’ testimony concerning the work Scott Brown was to do and Brown’s testimony that he was supposed to shear over thirty acres. The trial |13court concluded that Underwood performed his end of the bargain by clearing the land to the second level by removing stumps and brush and root raking the property four times, which exceed their agreement. Underwood did the job in 32 days which the trial court determined was a reasonable length of time. The condition of the land was illustrated by photos Underwood supplied. The court found that Underwood did not bind himself to convert wooded property to pasture in one season.
The court rejected Underwood’s claim for bad faith damages, even though the testimony showed Rollins was difficult and a perfectionist. Likewise, the trial court rejected Rollins’ reconventional demand against Underwood for the work Rollins hired done after Underwood left the job. The trial court found that the work done by Fragala and Hobson was work Rollins originally contemplated doing himself after Underwood root raked the property twice. The trial court stated Rollins did not meet his burden of proving his claim. The trial court ordered Rollins to pay Underwood $33,000 for clearing 33 acres, subject to a credit for the $10,000 previously paid, plus all costs of the proceedings. The trial court also recognized the materialman’s lien against the property.
*176 DISCUSSION
In his appeal Rollins complained that the trial court erred in finding that the parties agreed that Underwood would clear the land to Level II, that the price was $1000 per acre and that Underwood cleared 33 acres. Rollins also maintained the trial court erred in dismissing his re-conventional demand against Underwood. Essentially, Rollins’ complaint is that the trial court made erroneous factual findings.
|UA contract is an agreement by two or more parties whereby obligations are created, modified or extinguished. La. C.C. art. 1906. The determination of the existence of a contract is a finding of fact which may not be disturbed on appeal unless it is clearly wrong. O’Glee v. Whitlow, 32,955 (La.App.2d Cir.4/07/00), 756 So.2d 1288. Further, it is well-settled that an appellate court may not set aside a trial court’s factual finding unless it is clearly wrong or manifestly erroneous.
Where there is conflict in the testimony, reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel its own evaluations and inferences are equally reasonable. Likewise, reasonable evaluations of credibility should not be disturbed on review. It is the factfinder’s duty to weigh credibility and accept or reject all or part of a witness’ testimony. Furthermore, when findings of fact are based on determinations of credibility of witnesses, the manifest error-clearly wrong standard mandates great deference to the determinations made by the trial court. If the trial court’s findings are reasonable when the record is reviewed in its entirety, the appellate court may not reverse them.
O’Glee, supra at p. 1291. (Citations omitted.)
The trial court correctly determined that, while disagreeing as to its terms, Underwood and Rollins had an oral contract for Underwood to clear Rollins’ property and for Rollins to pay Underwood for his services. After hearing extensive, conflicting testimony, the trial court made reasonable evaluations of credibility and factual inferences. The trial court accepted Underwood’s account of the parties’ negotiations and the agreements concerning the extent of the work to be done and the price therefor. Likewise, the trial court sifted through the testimony about the amount of property cleared and reasonably found that Underwood cleared 33 acres. 11RThe trial court rejected Underwood’s demand for bad faith damages and ruled that Rollins had not proved his re-conventional demand.
Our review of this entire record reveals those conclusions were neither manifest error nor clearly wrong. The trial court’s factual findings were reasonable and supported by the record.
DECREE
For the reasons set forth by the trial court, the judgment is AFFIRMED at Bennie J. Rollins’ costs.