877 So.2d 156 (2004)
William E. CROWE, Plaintiff-Appellee,
v.
HOMESPLUS MANUFACTURED HOUSING, INC.; Jeff Foote, Individually; and Shane Scott Upshaw, Individually, Defendant-Appellant.
No. 38,382-CA.
Court of Appeal of Louisiana, Second Circuit.
June 21, 2004.
Watson, McMillin & Harrison, L.L.P. by David Carlton McMillin, Monroe, for Defendant-Appellant, Homesplus Manufactured Housing, Inc./ Defendants-Appellees, Jeff Foote and Shane Scott Upshaw.
Michael S. Coyle, Ruston, for Plaintiff-Appellee, William E. Crowe.
Before WILLIAMS, PEATROSS and DREW, JJ.
DREW, J.
The primary issue is whether the trial court erred in finding that an oral contract of employment existed between William E. Crowe, plaintiff, and HomesPlus Manufactured Housing Inc., defendant. HomesPlus contended that the trial court was clearly wrong in finding the evidence was sufficient to prove the parties entered into an oral employment contract. For the following reasons, the judgment of the trial court in favor of Crowe is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND
Crowe was a co-owner with William J. Meyer of Bud's Mobile Homes d/b/a Lincoln Home Center, a business which sold *157 and serviced mobile homes in Ruston. Jeff Foote and Shane Scott Upshaw, officers of HomesPlus, contacted Crowe in March 1999 because they wished to purchase Bud's and the property on which the business was located.
Via stipulation, the parties placed into evidence the July 1999 letter of intent signed by Meyer, Crowe, and Foote for HomesPlus; an unsigned employment contract; the October 13 memo to a law partner from defendant's primary counsel, Tod Cagle; the October 14, 1999, memo from his law partner to Cagle; the settlement statement; and the HomesPlus Ruston sales figures for 2000. HomesPlus placed into evidence without objection: (1) the act of sale of the business and moveable property; (2) the deed executed by the parties to the immovable property; (3) Crowe's pay stub from HomesPlus; (4) an initial offer from Upshaw dated May 21, 1999; and (5) a counterproposal from Crowe dated June 11, 1999.
From the judgment in favor of Crowe, HomesPlus appealed.

REASONS FOR JUDGMENT
The trial court observed that:
 For 16 years Crowe co-owned Bud's located on the I-20 service road in Ruston.
 Foote and Upshaw approached Crowe and his co-owner in March 1999 and the parties negotiated for the sale of the business and immovable property.
 Crowe's contention was that, as partial consideration for the sale, Crowe would be employed as General Manager of HomesPlus for a period not less than one year at a salary of $4,000 per month plus 40% of the gross profits in excess of $120,000.
 In November 1999, in two acts of sale, Crowe and his partner sold the business and the immovable property to HomesPlus.
 No written employment contract was executed, but Crowe began working for HomesPlus at the agreed salary and capacity on November 23, 1999.
 On December 7, 1999, HomesPlus terminated Crowe, who alleged he was wrongfully terminated and had a one-year employment contract. HomesPlus maintained that Crowe was an "at will" employee who was fired for failure to perform employment duties.
 Crowe sued HomesPlus, Upshaw, and Foote; by stipulation, the individual defendants were dismissed from the action.
The trial court cited La. C.C. art. 1846, which provides, in pertinent part:
If the price or value is in excess of five hundred dollars, the contract must be proved by at least one witness and other corroborating circumstances.
In addition to Crowe's testimony, the trial court found the following was corroborating evidence:
 All testified that it was Foote and Upshaw's idea to hire Crowe; Foote and Upshaw considered Crowe's employment essential to the business.
 The letter of intent among the parties corroborated Crowe's assertions concerning the terms of the employment agreement, stating that if no employment contract was reached, the sale terminated and the buyers could have their $50,000 deposit refunded.
 Neither Upshaw nor Foote asked for a return of the deposit.
 Other documents reflected the parties' attempts to complete an employment contract.
The parties testified that disagreements over various "perks" requested by Crowe resulted in the failure to sign the employment *158 contract. The trial court observed that the basic terms of Crowe's employment were never at issue and noted that no one told Crowe his employment was dependent on a written contract.
The trial court concluded that Crowe had met his burden of proving that he had an oral contract of employment for a term of one year at $4,000 per month and that HomesPlus terminated Crowe without cause. Therefore, HomesPlus was responsible for Crowe's damages of $48,000 less salary already paid.

TESTIMONY

By Bill Crowe
In addition to recounting his background and 24 years' employment in the mobile home industry, Crowe testified that:
 He belonged to and held offices in various state and national manufactured housing associations.
 He was being inducted into the Louisiana Manufactured Housing Association's Hall of Fame.
 He had been appointed by the governor to the Louisiana Manufactured Housing Commission.
 Foote and Upshaw approached him at a mobile home show in March 1999 about buying the business and the land on which it was located; they also stated they wanted Crowe to work for HomesPlus for a minimum of one year due to his reputation and good will in the community.
 Negotiations began in April 1999, primarily by phone and fax.
 If HomesPlus bought the business, Foote and Upshaw specified that they would hire Crowe.
 The agreed prices were $175,000 for the land and $100,000 for the business.
 Part of the consideration for the sale was HomesPlus's agreement to employ Crowe as general manager of the Lincoln Parish business for not less than one year at $4,000 per month plus 40% of the gross profits (less any salaries) exceeding $120,000.
 Neither Foote nor Upshaw ever requested the $50,000 deposit be returned or stated to him that the sale closing would not occur.
 The letter of intent did not require that Crowe's employment contract had to be written.
 Crowe was satisfied with the agreed compensation package and went to work on November 23, 1999; he was paid per the agreement until his termination on December 7, 1999.
 Crowe received no employment or policy/procedure manual.
 At termination, Crowe was informed HomesPlus had a good young salesman who wanted a promotion; the Lincoln Parish location was the only place the defendant could make the other employee a manager.
 During negotiations, Foote and Upshaw told Crowe that HomesPlus would not purchase the business if Crowe did not agree to be employed.
 A week or two before the November 22, 1999, closing, Crowe had a meeting in West Monroe with Foote and Upshaw at which they reached an oral contract of employment with the terms noted above as to compensation and the term of employment.
 Two or three days before closing, Foote called to tie up "loose ends" concerning Crowe's cell phone, expenses for association meeting, and a credit card, matters which Crowe considered minor, since the parties had an agreement about his employment.

*159  Sometime prior to the West Monroe meeting, Crowe received a draft of an employment contract containing the agreed compensation terms; the employment contract was never executed. Crowe believed he had a oral contract for one year's employment.
 Foote, Upshaw, and their attorney, Tod Cagle, never told Crowe he did not have an oral employment contract, nor did they send him a letter or document so stating. They also never told Crowe he was an at-will employee.
 Prior to the closing on the land, Cagle indicated to Crowe that there were minor issues to be worked out in the written employment contract which would not be signed at the closing. Cagle did not tell Crowe he had no employment contract until the written employment contract was signed.
 Crowe was not represented by an attorney during the negotiations and closing.
 Meyer, Crowe's partner, signed the Letter of Intent on July 3, 1999; Crowe, on July 5; and Foote, on July 6. A great deal of negotiation occurred between July and the November 22, 1999, closing.
 There was "no animosity or anything" and "we pretty well came to an agreement that I would be employed for a year." Crowe was initially offered six months' employment and rejected it.
 Crowe understood there would be a written employment contract with HomesPlus; Crowe did not feel the contract needed to be signed after Foote and Upshaw gave their word about his employment compensation and term; Crowe's intent along with Foote and Upshaw was that there was going to be a written contract of the agreement. Crowe understood the written contract would memorialize the agreement already reached.
 Crowe acknowledged that the payments in the sale differed from the terms in the July 1999 Letter of Intent.
 A week or two before closing, Cagle phoned to state the employment contract would not be signed at closing, but did not inform Crowe there would be no employment contract.
 Crowe emphatically denied Foote called before closing to state there would be no employment contract, although Crowe could come to work as general manager.
 A few days before closing Foote called and asked if Crowe would mind waiting until after closing because "there are a few of these minor details that we need to get ironed out and get in writing before we do the employment contract." Because Crowe was convinced he had a year's contract with HomesPlus, Crowe agreed.
By Tod Cagle
 Cagle represented HomesPlus, Foote and Upshaw in the purchase of Bud's from Crowe and his partner.
 Cagle was asked, probably by Foote, to put together an employment contract for Crowe who was to be employed as general manager by HomesPlus.
 Foote agreed that Crowe would work for HomesPlus for one year. The parties had also agreed that Crowe's compensation would be $48,000 per year plus 40% of any excess over $120,000.
 Crowe also wanted a cell phone, a credit card and expenses for business meetings, benefits to which Foote and Upshaw did not agree. Foote and Upshaw wanted a written employment contract.

*160  He informed Crowe there would be no employment contract executed at the closing, and inquired if Crowe was ready to proceed with the closing. Cagle did not know if he informed Crowe there would never be an employment contract. He was concerned that Crowe show up at the closing.
 He did not send Crowe a letter stating there would not be an employment contract and did not inform Crowe his one-year employment at $48,000 was contingent on a written contract of employment.
 A few days before the November 22 closing, Cagle spoke with Crowe to make certain Crowe knew that "we didn't have an agreement as to the employment contract and to make sure he was gonna show up and consummate the sale."
 Cagle told Foote to talk with Crowe also.
 Cagle did not believe his clients had an employment contract with Crowe who did not assert he had an oral contract of employment in that phone call with Cagle.
 Cagle informed Crowe that due to the Letter of Intent, Crowe did not have to proceed with the sale. Crowe's response was that he had informed his partner he would be sending him money from the sale and Crowe was ready to proceed.
 The parties varied the date of closing and the payment times from those provided in the Letter of Intent initially signed.
 Instructed by his clients to get a written employment contract, Cagle worked as a negotiator among the parties for the employment contract and was unsuccessful in getting an agreement. Cagle prepared multiple drafts.
 Within a week of closing, Cagle knew there was not going to be an employment contract, written or oral, for Crowe as part of the transaction and the purpose of his call to Crowe was to inform him of that fact.
By Jeff Foote
 HomesPlus, Foote, and Upshaw stated in response to interrogatories that:
Mr. Crowe was retained as an employee with HomesPlus under belief that he would be able to assist HomesPlus in retaining good will from the prior business operations and keep the new business operations going in a business like manner.
 There were no written reprimands of Crowe's job performance for HomesPlus; Foote could recall no oral reprimands concerning Crowe's job performance. There was no employment manual.
 Foote could recall no specific reasons for the termination and said, "We just felt like he was unbecoming as-of a manager at that point in time."
 Although the answer to Crowe's petition stated that Crowe was fired by reason of failure to properly perform his employment duties, there was no documentation or evidence of that allegation.
 Foote did not think he specifically told Crowe he could be fired at any time, but did tell him there "was gonna be no employment contract."
 Foote acknowledged that, "Our intent was to have a one year agreement with Mr. Crowe in negotiations and our intent was to pay him four thousand dollars a month. I mean we said it in the letter of intent. It was all there. We wanted Mr. Crowe to come to work for us in the negotiation phase. *161 There was no question  There's no question about that."
 They never told Crowe prior to closing that he could be fired at any time.
 On advice of Cagle, Foote called Crowe prior to the sale and said, "Mr. Crowe, if you wanna sell your business there will be no employment contract. You can come to work for us and this is what we'll pay you but there's gonna be no terms. If you wanna sell the business, we will proceed. That's it."
 Among Crowe's unacceptable practices were watching TV in the office, having solitaire up on his computer screen, and smoking in the office.
 Foote never told Crowe his employment was contingent on a written contract.

By Shane Upshaw
 HomesPlus retained Crowe under the belief that he would be able to assist HomesPlus in retaining good will from the prior business operations and keep the business operations going in a businesslike manner.
 Crowe's salary was to be $4,000 per month; Crowe went to work and was paid that amount.
 Crowe was terminated for failure to operate in a professional manner including smoking in the office, which he was doing the day he was fired.
 Upshaw did not agree that Crowe was to be employed for one year.
 At closing, HomesPlus was not offering Crowe an employment contract.
 They knew Crowe would not be a long term employee because Crowe stated he had considered retiring and traveling in a motor home and was in poor health.
 They had someone in their Monroe office who had gained sufficient experience during the protracted negotiations that they felt would do a better job than Crowe, so Crowe was terminated. Crowe would not have been terminated had there been a one-year employment contract.
 Crowe was mistaken in thinking there was an oral employment contract.
 HomesPlus did not agree to a one year term of employment for Crowe.
On rebuttal, Crowe stated that after the meeting in West Monroe, in his mind, it was all set that the parties had agreed he was to work for one year at $48,000 plus the percentage of the gross profit in excess of $120,000 per year. He reiterated that Cagle stated only that the employment contract would not be signed at closing. Crowe did not consider the absence of an employment contract at closing to be significant because he had an oral employment agreement with Foote and Upshaw. In Foote's call prior to closing, Foote informed Crowe they could not sign the employment contract at closing because there were kinks to be worked out regarding perks.

DISCUSSION
Under Louisiana law, formation of a valid and enforceable contract requires capacity, consent, a certain object, and a lawful cause. The court must find there was a meeting of the minds of the parties to constitute the requirement of consent. Arias v. Albe, 04-26 (La.App. 5th Cir.5/26/04), 876 So.2d 179.
The existence or nonexistence of a contract is a question of fact. Townsend v. Urie, XXXX-XXXX (La.App. 1st Cir.5/11/01), 800 So.2d 11, writ denied, XXXX-XXXX (La.9/21/01), 797 So.2d 674; Fox v. LAM, 25,616 (La.App.2d Cir.2/23/94), 632 So.2d 877. The determination of the existence of a contract is a finding of fact, not to be *162 disturbed unless clearly wrong. O'Glee v. Whitlow, 32,955 (La.App.2d Cir.4/7/00), 756 So.2d 1288.
The trial court cited Smith v. Dishman & Bennett Specialty Co., Inc., 35,682 (La.App.2d Cir.1/23/02), 805 So.2d 1220, 1223-1224, a suit to recover additional wages in excess of $500.00:
... [U]nder an oral contract of employment, the basic rule governing proof is the second paragraph of La. C.C. art. 1846, which requires that plaintiff prove his case by one credible witness "and other corroborating circumstances." The plaintiff may be the one credible witness. "Other corroborating circumstances" need only be general in nature; independent proof of every detail of the agreement is not required....
Moreover, a court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. When there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review; the issue for the reviewing court is not whether the trier of fact was wrong, but whether the factfinder's conclusions were reasonable under the evidence. When a factfinder's determination is based on its discretion to credit the testimony of one of two or more witnesses, that finding can virtually never be wrong.
Simply put, if the trial court's findings were reasonably based upon the entire record on appeal, this court may not reverse the judgment. Underwood v. Rollins, 35,544 (La.App.2d Cir.2/27/02), 811 So.2d 168, citing O'Glee v. Whitlow, supra.
Crowe relied upon the July 1999 Letter of Intent signed by Crowe's co-owner, Crowe, and Foote which provided the following for the employment agreement:
4. Employment Agreement: Both Seller and Purchaser acknowledge that they intend to secure Bill Crowe as the manager of the Lincoln Home Center for a minimum period of one year from the date of closing. Should HomesPlus Manufactured Housing, Inc. and Bill Crowe fail to reach an agreement regarding his employment, this agreement terminates and Purchaser shall be entitled to a refund of the $50,000.00 deposit and all parties shall be relieved from any and all liabilities therein. In addition, upon completion of the employment by Bill Crowe with purchaser, Bill Crowe agrees to enter into a legally binding non-competition agreement with Purchaser. [a handwritten note at the conclusion of part # 4 states: "For 2 years"]
HomesPlus pointed out and Crowe acknowledged that the actual sales of the business and land did not conform to the July 1999 Letter of Intent because the closing date and payment provisions were different. HomesPlus's position was that the parties continued negotiations on the employment contract until negotiations were stopped before the sale; therefore, no meeting of the minds ever occurred concerning the employment contract. According to HomesPlus, the trial court was clearly wrong and manifestly erroneous in finding that Crowe proved an employment contract was entered.
HomesPlus urged on appeal that based upon Crowe's testimony, Crowe only thought he had an oral contract but was mistaken. Relying on the undisputed facts that negotiations about the employment contract were extensive and that everyone contemplated that the employment contract would be reduced to writing, HomesPlus asserted strongly that its attorney and officers informed Crowe prior to closing *163 that there would be no employment contract.
As previously noted, when testimony conflicts, a trial court's reasonable evaluations of credibility and reasonable inferences of fact will not be disturbed on appeal; the issue is not whether the trial court was wrong, but whether the court's conclusions were reasonable under the evidence. When a factfinder's determination is based on its discretion to credit the testimony of one or two witnesses, that finding can virtually never be wrong. Here, the trial court accepted as credible Crowe's version of the transactions.
Clearly, negotiations over the perks were contested and lengthy, and an agreement was never reached on the matters of travel expense, credit cards, and cell phone for Crowe. This court found a valid contract of sale in O'Glee v. Whitlow, supra. The O'Glees and the buyers agreed on the price and basic payment terms for the sale of a restaurant. The buyers took possession, made some payments and later stopped payments contending that the sale was not valid, since the contract was not reduced to writing as contemplated and details remained to be worked out. This court accepted the trial court's finding that a valid, binding agreement existed and the sale was perfected. Although the present dispute does not concern the sale itself, the analogy is clear. The trial court found Crowe's employment contract existed even though the contemplated written contract had not been completed and details remained to be resolved.
As specifically pointed out by the trial court, the essential elements of the employment contract (term and compensation) were never at issue. Indeed, both HomesPlus's attorney and Foote testified that was the agreement. The trial court rejected conflicting testimony and accepted as credible Crowe's testimony that:
 Prior to the closing, he was informed the employment contract would not be signed at the closing because of the disputed perks. He expected the written contract would later memorialize their agreement.
 He was never informed that his contract had to be in writing to be valid.
 He was never told that there would never be an employment contract.
 He was not concerned about the lack of a signed contract because he had the word of Foote and Upshaw at their West Monroe meeting concerning the term and compensation of his employment.
After accepting Crowe as the one credible witness required to prove the existence of the oral contract, the trial court found sufficient corroborating evidence. Relatively early in the negotiations, the parties agreed to the term and compensation for Crowe's employment. Defendant admitted that Foote and Upshaw considered Crowe's employment essential to the purchase. Not seeking to back out and have the deposit returned, HomesPlus purchased the business and land. The next day Crowe immediately went to work in the agreed position, general manager, at the previously-agreed salary. The parties conducted themselves as if the employment contract was in effect. Crowe was terminated only fourteen days later without any documentation of alleged misconduct. HomesPlus had simply decided on different staffing for the Ruston business.

CONCLUSION
After listening to the testimony, examining the documents in evidence, and considering post-trial briefs, the trial court issued an extensive and well-reasoned opinion which concluded that Crowe had an oral employment contract with HomesPlus. *164 Our review of this record revealed that the trial court's findings were entirely reasonable.

DECREE
The judgment in favor of plaintiff, William E. Crowe, and against defendant, HomesPlus Manufactured Housing, Inc., in the amount of $48,000.00 less a credit of $2,266.61, along with costs and legal interest from the date of judicial demand, is affirmed. Costs of the appeal are assessed against HomesPlus.
AFFIRMED.