927 So.2d 677 (2006)
SOUTHERN TREATS, INC. f/k/a Christopher Scott Ferris d/b/a Southern Treats, Plaintiffs-Appellants,
v.
TITAN PROPERTIES, L.L.C., Porters of Louisiana, L.L.C., and Mark Porter, Defendants-Appellees.
No. 40,873-CA.
Court of Appeal of Louisiana, Second Circuit.
April 19, 2006.
*678 Pettiette, Armand, Dunkelman, Woodley, Byrd & Cromwell by Robert A. Dunkelman, Shreveport, S. Michael Cooper, for Appellants Southern Treats, Inc. and Christopher S. Ferris.
Jeff R. Thompson, Bossier City, for Appellee Titan Properties, L.L.C.
Before WILLIAMS, STEWART and GASKINS, JJ.
STEWART, J.
Southern Treats filed suit against Titan Properties seeking a declaratory judgment regarding its rights under an alleged long-term lease and injunctive relief to preserve the status quo in accordance with the terms of the lease. Titan Properties filed a reconventional demand for eviction of Southern Treats and alleged that the parties had a verbal month-to-month lease. The trial court found there to be a two year lease between the parties and denied all relief. Southern Treats appealed. Finding error in the trial court's judgment, we reverse and render judgment in favor of Southern Treats as explained in this opinion.

FACTS and TESTIMONY
Scott Ferris along with his sister and brother-in-law, Cindy and Stan Rogers, decided to form a business, Southern Treats, to obtain and operate a TCBY / Mrs. Fields franchise in Shreveport. In April 2002, Ferris met with Mark Porter, the owner of a business and property at the intersection of Youree Drive and East Bert Kouns Industrial Loop, about purchasing a piece of property at that location.[1] *679 Porter was not interested in selling but was interested in Ferris's proposal to open a yogurt shop in that location. The parties came to an agreement whereby Porter would pay to build the store on his property and lease it to Southern Treats. This dispute arises from that arrangement.
Southern Treats' petition alleged that it had a lease for an initial term of 5 years with two options to renew for 5 years each. Rent was $2,250 per month in accordance with the parties' agreement that rent would be calculated at twelve percent of the cost of the building up to $225,000. However, at the opening of the business, Porter presented a new lease with monthly rent increased to $3,600. Southern Treats refused to sign as it did not reflect their agreement with Porter. Porter later presented a second lease with a monthly rent of $2,250 and a five year term. Southern Treats refused that lease as well because it provided only two options to renegotiate contrary to their agreement for options to renew. After paying the agreed upon rent of $2,250 for twenty months, Southern Treats was notified by letter dated March 17, 2005, that it was a month-to-month tenant and that it must vacate by April 1, 2005. According to the letter, they could remain by signing a written lease with rent at $4,000 per month. Southern Treats' petition requested a determination of their rights under the original lease and injunctive relief to preserve their agreement.
In answer, Porter asserted that the parties never executed a written lease and claimed there had been no meeting of the minds as to lease terms, particularly rent. He alleged that the parties entered a verbal month-to-month lease in July 2003 that he now wished to terminate.
At the hearing, Scott Ferris testified that he first met with Mark Porter in April 2002, at which time they discussed the amount of square footage that would be needed for the business and agreed that Porter would own the structure and lease it for twelve percent of the building cost. Relying on that agreement, Ferris prepared a business plan to obtain financing to open the business. The plan, which was admitted into evidence, included a projected monthly rent of $2,000 based on the agreed upon rate of twelve percent of the estimated building cost of $200,000. After getting loan approval, the parties, including Porter, met with a TCBY representative to get approval for the building site. Porter suggested an architect for the project, and Southern Treats paid $10,000 for the architect to design the building to suit the needs of the business. In October 2002, Ferris received franchise papers to sign. He needed to obtain a lease for 15 years. He drafted an agreement in the form of a letter to be sent to Jerry Nisbet, the vice-president of leasing with Mrs. Fields Famous Brands, and made an appointment to meet with Porter on October 28, 2002. At the meeting, Porter and Ferris signed the agreement which states:
An agreement is made between Mark Porter, LESSOR and Scott Ferris, LESSEE, dated this 28th day of October, 2002.
The agreement provided a lease term of five years with two options of five years each. Both parties signed the agreement. On cross examination, Ferris stated that he made a mistake in neglecting to specify *680 the rent agreed to in the letter. He testified that he took Porter at his word regarding their agreement as to rent and explained that their lease agreement consisted of the verbal agreement as to rent and the written agreement of October 28, 2002.
After securing the fifteen year agreement, Ferris paid a franchise fee of $35,000. Southern Treats and Porter worked together to obtain construction bids from contractors recommended by Porter. The first bid offered was for $321,000. Because the rent was to be based on the cost of construction, Ferris told Porter the bid was too high. At a meeting, Porter told the same thing to the bidder, indicating that rent would be based on the building cost. The parties obtained two other bids and accepted a bid of $215,000 by Brian Builders submitted on March 1, 2003. At a meeting with Porter to discuss accepting the bid, the parties again discussed rent being twelve percent of the building cost. Cindy Rogers suggested setting the cost at $225,000 to take overages into account. Thus, rent would be $2,250 per month. Porter did not object to the amount of rent or mention any increases. Construction began on March 10, 2003. Southern Treats put $7,000 into the construction of the building to keep the cost basis of their rent at $225,000, the amount paid by Porter for construction.
The grand opening for friends and family was held on July 10, 2003. Porter met with Ferris at the opening and presented him with a written lease agreement to sign. Contrary to what they had agreed upon, the new lease provided for rent of $3,600 per month. Ferris refused to sign. Ferris and the Rogers met with Porter the next day to discuss the dispute. At that meeting, Ferris and the Rogers first learned of a proposal Porter had received from Waffle House before construction began, offering to build its own building and pay rent for the ground only in the amount of $1,800 per month. They reminded him that they already had an agreement for rent of twelve percent of the building cost and for five years with two five year renewals. Ferris showed him the agreement they had signed on October 28, 2002. Ferris testified that Porter indicated he might have made a mistake and that he would have to "suck it up." At a second meeting, Porter produced another lease with rent of $2,250 in accordance with the agreed upon formula but providing only a five year term with options to renegotiate. It did not reflect the agreed upon options to renew. Thus, Ferris did not sign it.
Southern Treats began operating and paying $2,250 in rent each month. Sometime prior to March 17, 2005, Porter called another meeting to discuss an offer presented to him on behalf of Subway proposing that it operate alongside Southern Treats in the same space. Ferris testified that they declined the offer. Thereafter, Southern Treats received the notice to vacate letter.
Ferris's testimony was corroborated by that of Stan and Cindy Rogers. Stan recalled that when they met with Porter to discuss the construction bids, they also discussed rent being twelve percent of the building cost. He specifically recalled using his cell phone's calculator to determine the amount of rent after Cindy mentioned setting the cost at $225,000 to take overages into account. Porter said nothing at the meeting about increasing the rent to reflect land value. Stan also recalled the subsequent meetings with Porter after the opening at which he tried to get Southern Treats to enter a new lease for more rent.
Cindy Rogers likewise recalled meeting with Porter to discuss the bids and agreeing to set rent at twelve percent of the building cost. She suggested adding *681 $10,000 for overages to the bid by Brian Builders. They agreed that Southern Treats would pay costs over $225,000 so that their rent would not go up. She testified that Porter did not mention anything about increasing the rent to reflect land value. She also recalled meeting with Porter after the grand opening when he tried to increase the rent to $3,600 on account of the land value. When they disagreed, he said that he would honor his word regarding their agreement. She testified that he never mentioned anything about entering a two year lease, and the first she heard of such a lease was at trial. She stated that their agreement had always been a five year term with two options. Cindy also testified that she had worked for TCBY for over 14 years. She recalled rent for two different shops being $1,800 a month for about 1800 square feet of space and $2,600 a month for about 3,000 square feet.
Mark Porter testified that as the owner and manager of Titan Properties, a real estate holding company, he leases between 30 and 35 properties and always uses standard lease forms which include up to 21 paragraphs addressing various issues. He denied entering a lease as claimed by Southern Treats. Porter recalled his first meeting with Ferris about the project. They discussed rent. He claimed he told Ferris that he wanted a twelve percent return on his investment of construction costs and something for the land value. However, he admitted that he did not mention anything at subsequent meetings about adding in land value until he presented a written lease at the opening.
Porter paid $225,000 in construction costs for a build-to-suit building, one built in accordance with TCBY's specifications. Porter explained he had no problem putting money into the project because he could always modify the building and lease it to other tenants. He described the business as being on the second busiest intersection in Shreveport and stated that he could "lease it for whatever."
Porter claimed that the October 28, 2002 agreement signed by him was meaningless. He described it as a letter of intention which he signed to help Ferris speed up the franchise process. He asserted that Ferris drafted the letter from an example sent in a packet by TCBY stating it was not intended to be a lease. However, he admitted that the document he signed did not include that language. He stated that he looked at the letter and realized it was wrong, but he considered it to be insignificant and signed. He did not tell Ferris that he did not consider it binding or that another signed agreement would be necessary.
Porter recalled the meetings to discuss the construction bids. The parties met at his office after receiving Brian Builders' bid, but he did not recall the conversation. He admitted that he did not bring up the land value issue at either meeting. Porter also testified that he received a proposal in March 2003 from a representative for Waffle House offering a ground lease of $1,800 a month for five years with nine five year options. He did not mention the offer to Ferris or the Rogers, and he did not tell them that he considered the land value to be what Waffle House was offering to pay for a ground lease. He did not feel it important to communicate such information to Ferris even though Southern Treats was proceeding with plans for the business and putting some money into construction of the building.
Porter testified that he presented a lease to Ferris at the grand opening, because Ferris had not yet presented a lease for him to sign. The lease had a five year term and rent of $3,600 per month. He then met with Ferris and the Rogers *682 on July 11, 2003. He explained that the amount of $3,600 was a fair rate that included land value, which he claimed was established by the Waffle House ground lease offer. When they would not agree to pay $3,600, he told them that he had not been clear about the land value, but that he would honor his word and "suck it up for two years." Later that month he presented a second written lease to Ferris. The lease, which was admitted into evidence, had rent in the amount of $2,250 per month and a term of five years with two five years options "to be negotiable." Porter claimed the term on the lease was a typographical error and that he had told his assistant to put a two year term. It was Porter's testimony that the parties had a verbal agreement as of July 2003 for a two year lease at $2,250.
Porter further testified that he received an offer from a representative for Subway in February 2005 to share space in the building and pay $2,700 per month in addition to the rent paid by Southern Treats. Because Southern Treats was not paying what he considered to be market rate, he went to them with the offer as a win-win situation for all concerned. Southern Treats declined the offer. Porter then contacted an attorney to begin eviction of Southern Treats. When questioned about why he would send a notice to vacate months prior to the end of the two year lease he claimed they had agreed to in July 2003, Porter stated that he did not know the law and that he considered it a month-to-month lease for two years. He stated that he knew the end of the lease period was coming up and that he was "trying to get ahead of it."
The last witness was Deegie Lawless, Porter's assistant from June 2003 through July 2004. She testified that she prepared lease documents for Porter by filling in the blanks on the forms as directed by him. She recalled a meeting at which he asked her to change the rent amount to $2,250 on a lease and to put individual signature lines on the back. She testified that he did not tell her to change the five year term to two years.

TRIAL COURT'S RULING
Following the testimony, the court rendered an oral ruling denying Porter's request for eviction and Southern Treats' requests for injunctive and declaratory relief. The trial court found that all the witnesses testified credibly as to how they viewed the facts, but it specifically accepted Porter's testimony regarding the existence of a two year lease agreement. The trial court further found that prior to the two year agreement there had been no meeting of the minds as to the terms of the lease, specifically as there was "no written evidence that there was a final resolution of the [rent] figure." The court's recall of Ferris's testimony was that the parties had not discussed the rent amount between the time of the October 28, 2002 letter and the opening. The trial court concluded that the October 28, 2002 letter agreement signed by Porter and Ferris was not a lease. The court reasoned:
It doesn't have the necessary parts that one would expect in a lease. I rather believe that it was something that was set forward inthat was signed to send to the franchisor. The parties didn't put the finishing touches on their agreement. I think what we have is a two-year lease by Mr. Porter's agreement.
Judgment was signed on June 1, 2005, and Southern Treats' appeal followed.

APPLICABLE LAW and DISCUSSION
Southern Treats argues that the trial court's finding of a two-year lease was a "split the baby" verdict contrary to all of *683 the documentary evidence and clearly wrong. Southern Treats asserts that the evidence establishes that the parties agreed to a renewable five-year lease with monthly rent of $2,250. They had a written agreement as to the thing and the term and an oral agreement as to the rent.
Porter asserts that the trial court correctly determined there was no five-year lease, as there was no agreement as to the amount of rent or the term. Porter contends that the October 28, 2002 letter was not a lease. He argues that it merely duplicated examples sent by the franchisor and had inaccuracies regarding the parties. Moreover, the letter agreement did not include his standard lease provisions and served only Ferris's purposes.
Lease is a synallagmatic contract by which one party, the lessor, binds himself to give the other party, the lessee, the use and enjoyment of a thing for a term in exchange for a rent that the lessee binds himself to pay. La. C.C. art. 2668.[2] The essential elements of a lease are the thing, the price (rent), and consent of the parties. Pelican State Bank v. Webb, 175 So. 855 (La.App. 2d Cir.1937); Daigle v. Vanderpool, 2002-2005 (La.App. 1st Cir.6/27/03), 858 So.2d 552; Lemke v. Amidon, 542 So.2d 563 (La.App. 1st Cir.1989). The form of a lease may be written or verbal. La. C.C. art. 2681; Lemke v. Amidon, supra. The intent to create a lease may be inferred from the established facts, circumstances, and acts of the contracting parties. Pelican State Bank v. Webb, supra. Either party may enforce a contract to lease at a future time if there is agreement as to the thing and rent, unless the parties understood it would not be binding until reduced to writing or agreement on other terms. La. C.C. art. 2670.
Rent must be agreed to by the contracting parties for a valid lease. Mouton v. P.A.B., Inc., 450 So.2d 410 (La.App. 3d Cir.1984), writ denied, 458 So.2d 118 (La.1984). The price must be certain and determinable. Pelican State Bank v. Webb, supra; D'Antonio v. Simone, 94-798 (La.App. 5th Cir.3/15/95), 653 So.2d 678. The rent must be serious and not out of proportion to the thing's value. La. C.C. art. 2675; Daigle v. Vanderpool, supra. The amount should either be fixed in a sum certain or determinable through a method agreed to by the parties. La. C.C. art. 2676. The term of the lease may be agreed to by the parties or fixed by law. La. C.C. art. 2678. Thus, agreement as to term is not an essential element of a lease.
The existence or nonexistence of a lease is a question of fact. Landers v. Integrated Health Services of Shreveport, 39,739 (La.App.2d Cir.5/11/05), 903 So.2d 609, citing Crowe v. Homesplus Manufactured Housing, Inc., 38,382 (La.App.2d Cir.6/21/04), 877 So.2d 156. An appeals court may not set aside a trial court's finding of fact in the absence of manifest error or unless clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). This standard requires the appellate court to give great deference to credibility determinations made by the trier of fact. Id. However, where documents or objective evidence contradict the witness's story or where the story is internally inconsistent or implausible on its face such that a reasonable factfinder would not give it credit, an appellate court may find the trial court's factual finding clearly wrong or manifestly erroneous even when based on a credibility determination. Id.
*684 Also, where legal error impedes the fact-finding process, the manifest error standard no longer applies; when possible, the appellate court should conduct a de novo review of the record and render judgment on the merits. St. Andrews Place, Inc. v. City of Shreveport, 40,260 (La. App.2d Cir.11/4/05), 914 So.2d 1203, citing Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742. Legal error occurs when the trial court applies incorrect principles of law. Such errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. Lasha v. Olin Corp., 625 So.2d 1002 (La.1993).
Having thoroughly reviewed the record, including the trial court's ruling at the close of the hearing, we find legal error in its application of the law in determining whether there was a lease between the parties. The trial court found "no written evidence" of an agreement on the amount of rent. The court also determined that the written agreement of October 28, 2002, was not a lease, because it did not have the "necessary parts that one would expect in a lease" and the parties had not "put the finishing touches on their agreement." The law provides that the form of a lease may be oral or written. La. C.C. art. 2681. The trial court restricted its analysis to whether there was written evidence of the lease agreement between the parties and failed to address whether there was an oral agreement as to any of the lease terms. It also appears that the trial court was looking for something other than agreement as to the essential elements required to confect a lease. The trial court's finding of a two-year lease "by Mr. Porter's agreement" is also contrary to the very definition of a lease which is contract between two parties requiring the consent of both as to the essential elements. See La. C.C. art. 2668; La. C.C. art. 1906. These legal errors were clearly prejudicial as they materially affected the outcome of the litigation and deprived Southern Treats of substantial rights. In light of the legal errors apparent from the trial court's ruling, a de novo review of the record is warranted.
Even in the absence of legal error, we also find manifest error in the trial court's ruling. The trial court's finding of a two-year lease was based on a credibility determination in favor of Porter. However, this credibility determination was clearly inconsistent with the documentary evidence, particularly the October 28, 2002 agreement and the two leases prepared by Porter, all of which had an initial term of five years. The credibility determination was also inconsistent with the testimony of every other witness, including Porter's former assistant who contradicted his claim that he asked her to change the term from five to two years. Finally, the credibility determination was inconsistent with the trial court's own conclusion that all the witnesses testified credibly as to how they viewed the facts. If all the witnesses were found credible, it is bewildering that the trial court would accept the testimony of the sole witness whose testimony was contrary to the others on the alleged existence of a two-year lease. We also find manifest error in the trial court's finding of no lease agreement for the reasons explained in our de novo review.
Our law requires courts to give legal effect to all written contracts according to the parties' intent as determined by the words of the contract when they are clear, explicit, and lead to no absurd consequences. First South Farm Credit, ACA v. Gailliard Farms, Inc., 38,731 (La. App.2d Cir.8/18/04), 880 So.2d 223. Signatures on an agreement are not mere ornaments. A person who signs a written agreement is presumed to know its contents *685 and cannot avoid its obligations by claiming that he did not read it, that he did not understand it, or that it was not explained. Id. See also St. Andrews Place, Inc. v. City of Shreveport, supra.
Porter and Ferris signed a written agreement on October 28, 2002. Although in the form of a letter to the franchisor's vice-president of leasing, it is still an agreement as indicated by the unambiguous phrase "[a]n agreement is made." The written agreement sets forth the thing to be rented and the term. The term agreed upon is five years with two five year options. The agreement is signed by Mark Porter and Scott Ferris. Porter even testified that he signed it as a letter of intention. As will be addressed, the parties had already agreed on a formula for calculating rent. Thus, with the oral rent agreement and the written agreement, they confected a valid lease and / or a binding and enforceable contract to lease at a future time.
Counsel for Porter argues that the letter agreement is not a lease because it contains various inaccuracies. We find no merit to this argument. Regardless of the alleged inaccuracies as to the description of the parties, there is no question that Porter and Ferris had full authority to enter the agreement on behalf of their respective businesses. Nothing in the record suggests that Porter was misled by the alleged inaccuracies or questioned them at the time of signing. We also find no merit to the argument that it was not intended as a lease because it was drafted from sample materials in a franchise packet sent to Ferris. Ferris's use of the materials as a guide to draft the agreement is not relevant to determining its meaning and legal effect. The fact that it was sent to the franchisor does not render it any less valid. Rather, that it was sent to show the existence of an agreement as to a specific lease term for purposes of securing the franchise further evidences the parties' consent to their agreement.
Although Porter testified that the document was meaningless and that he signed it to speed up the franchise process, he also testified that he did not voice objections or inform Ferris that he did not consider the agreement binding. Porter affixed his signature to a document clearly stating that it was an agreement. His signature is not a mere ornament, and he is presumed to know the contents of the document he signed. The written agreement establishes the thing to be rented and the term of five years with two options. While the written agreement alone is not sufficient as a lease, the record also establishes an oral agreement as to rent.
Testimony establishes that rent was agreed upon at the time of the first meeting between Ferris and Porter. It was to be twelve percent of the building cost. As noted, rent is sufficient if it can be determined by some method agreed to by the parties. La. C.C. art. 2676. Though Porter testified that he told Ferris at their first meeting that he wanted something additional for land value, he also testified that he did not discuss this additional price at any other meeting of the parties until he presented his own written lease at the grand opening over a year after he first met with Ferris about the project and after Southern Treats had moved into the building. In the meantime, the parties met to discuss the architect and construction bids. In accepting Brian Builders' bid and adding $10,000 for overages, the parties determined in accordance with the agreed upon formula that rent would be $2,250 per month. There were no objections by Porter, and his own testimony was that he mentioned nothing about land value even though he had recently received an offer which he believed reflected land *686 value and would have surely caused a substantial increase in the amount of rent. His lack of objection is properly construed as consent to the amount of rent. We can discern no reason why he would have neglected to inform Southern Treats that he wanted something more for land value at this pivotal juncture of the project. Both Ferris and the Rogers testified that Porter never discussed land value, and the first they heard of it was when Porter presented a new lease at the grand opening.
From this testimony, we find that the parties' agreement as to rent was for twelve percent of the building costs or $2,250 per month. The record does not establish that the rent is out of proportion to the value of the thing. In light of the facts and circumstances established at trial, we give no credence to Porter's claim that he mentioned land value at the initial meeting with Ferris and did not agree to rent that excluded the land value. The fact that Porter received subsequent offers and may have concluded that he could have made a better deal elsewhere does not negate his obligations under the agreement he made with Ferris.
The testimony establishes an oral agreement on a formula for calculating rent from the inception of the parties' project, a written agreement on October 28, 2002, as to the thing and term, and an oral agreement as to the specific amount of rent determined in accordance with the agreed upon formula prior to the start of construction. As stated, the intent to create a lease may be inferred from the established facts, circumstances, and acts of the contracting parties. Pelican State Bank v. Webb, supra. This is not a case in which a lessor simply leased a building to a business. Rather, the parties entered an agreement from the start for the construction of a build-to-suit building for the specific purpose of Southern Treats operating a TCBY / Mrs. Field's shop. Porter paid construction costs in return for a twelve percent return on his investment. He actively worked with Southern Treats to secure an architect and a reasonable bid for the project so as to keep costs and rent at an amount affordable to the new business. Southern Treats also paid a small part of construction costs as well as the architect's fee for a building it would not own. It also invested roughly $200,000 in obtaining the franchise and purchasing equipment for operations. It is implausible that either party would have proceeded with these arrangements without a lease. The facts, circumstances, and acts of the parties lead to the conclusion that they had an agreement for lease of the build-to-suit building for five years with two five-year options to renew and rent of $2,250 per month calculated in accordance with the formula of twelve percent of the building costs. The lease was confected through both a written agreement and an oral agreement as to the required terms. We find nothing in our law that would prohibit this.
While the agreement in this matter may be atypical of the lease agreements generally entered into by Porter through his real estate holding companies, the agreement is no less a lease under the law. The parties agreed to the essential terms for confecting a lease. Accordingly, we find in favor of Southern Treats regarding the existence of a lease for five years with two five-year options to renew with rent as stated herein. They are granted a declaratory judgment regarding the terms of the lease and injunctive relief preserving the status quo in accordance with the agreed upon terms. Porter's request for eviction is denied.

CONCLUSION
For the reasons stated in this opinion, the trial court's judgment is reversed, *687 judgment is rendered as stated above, and costs are assessed to appellee, Titan Properties/Mark Porter.
REVERSED.
NOTES
[1] Mark Porter is the owner and manager of Titan Properties L.L.C., a real estate holding company that owns the property at issue. Although Porter was dismissed as an individual defendant along with Porter's Cleaners, this opinion will refer to Porter rather than Titan, as Porter was involved in all meetings and negotiations acting as, and on behalf of, Titan.
[2] The Louisiana Civil Code articles pertaining to lease, Arts. 2668 to 2744, were revised, amended, and reenacted by Acts 2004, No. 821, effective January 1, 2005. With regard to the issues in this matter, there are no changes in the law.