STONE, J.
*535 N.B., I.B., and P.B. were removed from their mother's custody and subsequently adjudicated children in need of care under Louisiana law. Their mother, Clarissa Hammond ("Hammond"), agreed to a case plan presented by the Louisiana Department of Children and Family Services. Following a parental termination hearing, the trial court found the Department of Children and Family Services proved, by clear and convincing evidence, Hammond had not substantially complied with the case plan, there was not a substantial chance she would improve in the immediate future, and termination of her parental rights was in the best interest of N.B., I.B., and P.B. For the following reasons, we affirm.
FACTUAL BACKGROUND AND PROCEDURAL HISTORY
Hammond is the mother of three minor children, N.B., age 9 years; I.B., age 6 years; and P.B., age 3 years.[1] On July 3, 2015, deputies with the Ouachita Sheriff's Department arrived at the home of Russell Flowers ("Flowers") in response to a 911 call concerning a drowning. Upon their arrival, deputies discovered the unresponsive body of Hammond's five-year-old daughter, B.B. After several attempts by paramedics to resuscitate B.B., she was transported by ambulance to the hospital, where she was pronounced dead. For approximately 6 months prior to B.B.'s death, Hammond and the four minor children were living with Flowers in his home. Flowers is the father of Hammond's youngest child, P.B. On the day of B.B.'s death, Hammond reported she and B.B. were behind Flowers' house when B.B. climbed into a tree and fell into the Ouachita River. She stated she retrieved B.B. from the river, carried her inside the house, and placed her in the bathtub to warm her up. After she removed B.B. from the tub, Hammond placed the child on the bed and began performing CPR.
An autopsy report revealed that B.B.'s death was caused by multiple blunt force injuries to her head and lower extremities, which appeared to have been inflicted by a belt. There was no evidence that the minor child had drowned. B.B.'s body contained blunt force injuries that had already begun to heal, indicating the injuries had been there a while. Four days after B.B.'s death, while being formally questioned by authorities, Hammond reported that Flowers had actually beaten B.B. to death and had forced Hammond to corroborate the lie. N.B. and I.B. were also forced to lie to law enforcement concerning the cause of B.B.'s death. Ultimately, both Hammond and Flowers were arrested and charged with the second degree murder of B.B. The charges against both are currently pending.
On July 6, 2015, Ashlee Green ("Green") of DCFS filed an affidavit in support of an instanter order which stated the State had received a report of alleged neglect/lack of adequate supervision, death by abuse and *536 bruises concerning B.B. and the allegation of lack of supervision of N.B., I.B., and P.B. The surviving three children had bruises and otherwise showed signs of abuse and neglect. Green stated there was good cause to remove the children from the custody of the parent/caretaker pending the completion of the investigation and the filing of reports to the district attorney. The instanter order was issued, and the three children were placed in the temporary custody of DCFS.
A Court Appointed Special Advocate ("CASA") was appointed to represent the children. At a hearing to continue custody with DCFS, Flowers stipulated that the children were in need of care without admitting the allegations against him, as did Hammond and Nicholas Brister ("Brister"), the father of N.B., I.B., and B.B. The court found that remaining in DCFS custody was in the best interest of the children, and they were subsequently adjudicated as children in need of care.
The three children were originally placed in separate foster homes; however, according to the record, all three children are now placed together in one home. The primary goal of Hammond's case plan was reunification, with a secondary goal of adoption. The case plan included domains for parenting, housing, income, mental health, substance abuse, visitation, and domestic violence.
Approximately a year and a half after the children were placed in foster care, DCFS issued a recommendation that the goal of the case plan change from reunification to adoption. A report was written by DCFS to the trial court on June 1, 2016, and by the CASA on June 3, 2016, in anticipation of a permanency hearing, which was held on July 14, 2016. The trial court ruled the permanent plan should be changed from reunification to adoption.[2]
On November 15, 2016, DCFS petitioned the trial court to terminate Hammond's parental rights of the three minor children. After the termination hearing, the trial court found DCFS proved by clear and convincing evidence Hammond's parental rights of the three minor children should be terminated due to her misconduct pursuant to La. Ch. C. art. 1015(4), as well as her failure to substantially comply with her case plan and no reasonable expectation of improvement, pursuant to La. Ch. C. art. 1015(6). Furthermore, the trial court determined it was in the best interest of the three minor children that the parental rights of Hammond be terminated. The trial court terminated Hammond's parental rights and certified the children eligible for adoption. This appeal ensued.
DISCUSSION
Motion to Recuse
In her first assignment of error, Hammond argues the trial court erred in denying her motion to recuse. According to Hammond, during the child in need of care ("CINC") proceedings, the trial court was privy to evidence and information that may not have been relevant or admissible in the termination of parental rights proceedings. Therefore, the trial court should have recused itself from the termination hearing or referred the motion to recuse to another court for a hearing. The trial court denied Hammond's motion to recuse, finding Hammond's allegations to be speculative and not based on any specific grounds.
La. C.C.P. art. 151 provides the grounds upon which a judge shall be recused from a matter. Specifically, La. C.C.P. art. 151 provides in pertinent part:
*537 A. A judge of any court, trial or appellate, shall be recused when he ...
(4) Is biased, prejudiced, or interested in the cause or its outcome or biased or prejudiced toward or against the parties or the parties' attorneys or any witness to such an extent that he would be unable to conduct fair and impartial proceedings.
The grounds for recusal enumerated in Article 151 are exclusive and do not include a "substantial appearance of the possibility of bias" or even a "mere appearance of impropriety" as causes for removing a judge from presiding over a given action. Slaughter v. Bd. of Sup'rs of S. Univ. & Agr. & Mech. Coll. , 2010-1114 (La. App. 1 Cir. 08/02/11), 76 So.3d 465, 471, writ denied , 2011-2112 (La. 01/13/12), 77 So.3d 970. Moreover, a judge is presumed to be impartial. The party seeking to recuse cannot merely allege lack of impartiality; he must present some factual basis. Further, the bias, prejudice, or personal interest alleged must be of a substantial nature and based on more than conclusory allegations. Covington v. McNeese State Univ. , 2010-0250 (La. 04/05/10), 32 So.3d 223, 225.
If a valid ground for recusal is set forth in the motion to recuse, the judge shall recuse himself or refer the motion to another judge for a hearing. La. C. C. P. art. 154. However, when the motion to recuse fails to enunciate valid grounds for recusal, the trial judge may deny the motion without referring the matter to another judge. Lozier v. Estate of Elmer , 10-754 (La. App. 5 Cir. 02/15/11), 64 So.3d 237, 243, writ denied , 11-529 (La. 04/25/11), 62 So.3d 93. A trial court has discretion to determine if there is a valid ground for recusal set forth in the motion. Frierson v. Frierson , 14-64 (La. App. 4 Cir. 07/02/14), 2014 WL 3045068, 2014 La. App. Unpub. LEXIS 399, writ denied , 14-1628 (La. 08/22/14), 146 So.3d 540.
This Court finds the trial court did not abuse its discretion when it denied Hammond's motion to recuse. Hammond's motion did not set forth any specific allegations that would form the basis for a recusal. Hammond's argument only assumed the trial court, in hearing both the CINC and the termination of parental rights matters, may be unable to maintain impartiality in its ruling in the termination proceedings. The motion is mere speculation and seems to be more of a policy argument that the judge who hears the CINC matter should refrain from hearing the termination of parental rights matter. For the same reasons, we find the trial did not err in its refusal to reassign the motion to another judge for determination of its merits. Notably, after the trial court's denial, Hammond sought supervisory writs concerning whether the judge should have referred the motion to another division. This Court declined to exercise supervisory jurisdiction and denied the writ.
Additionally, this Court is not aware of any law that prevents a judge from presiding over both the CINC and the termination of parental rights proceedings. The 4th Judicial District Court, Juvenile Section, has a designated juvenile section wherein the judge in that section shall primarily handle juvenile matters. La. Dist. Ct. Rules, App. 3.1. The Honorable Sharon Marchman is the designated juvenile judge in the 4th Judicial District and, as such, she retains jurisdiction to preside over all cases involving juveniles, including but not limited to delinquency proceedings, child in need of care, families in need of services, involuntary or voluntary termination of parental rights, adoption, and any other proceedings necessary to carry out the laws affecting juveniles, their parents, *538 and sibling groups. Id. The 4th Judicial District Juvenile Court has not adopted any rule requiring separate judges to preside over CINC proceedings and termination of parental rights proceedings. This assignment of error is without merit.
Termination of Parental Rights
In her next assignment of error, Hammond argues the trial court erred in finding DCFS proved by clear and convincing evidence her parental rights should be terminated, and the termination was in the best interest of the minor children. Hammond contends she has substantially complied with the case plan, and the best interest of the children dictates she should be given additional time to complete the case plan. We do not agree.
The trial court's factual findings in termination of parental rights cases are subject to the manifest error standard of review. State ex rel. B.H. v. A.H. , 42,864 (La. App. 2 Cir. 10/24/07), 968 So.2d 881 ; State in the Interest of K.L.B. v. Biggs , 29,512 (La. App. 2 Cir. 02/28/97), 690 So.2d 965. The manifest error standard requires the appellate court to determine whether the record reflects the trial court was clearly wrong. State in the Interest of H.A.B. , 10-1111 (La. 10/19/10), 49 So.3d 345, 368.
DCFS' Burden of Proof
The parental rights of an individual may be involuntarily terminated upon a showing of one of the statutory grounds found in La. Ch. C. art. 1015. Termination of parental rights is a severe and final action, so the state must satisfy an onerous burden of proof, establishing each element of a ground for termination by clear and convincing evidence. La. Ch. C. art. 1035(A) ; Santosky v. Kramer , 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ; State ex rel. C.M.M. v. T.P.M. , 42,238 (La. App. 2 Cir. 05/09/07), 957 So.2d 330.
In this case, DCFS sought to have Hammond's parental rights terminated under La. Ch. C. art. 1015(4) and (6). La. Ch. C. art. 1015(4) states in pertinent part:
Misconduct of the parent toward this child or any other child of the parent or any other child which constitutes extreme abuse, cruel and inhuman treatment, or grossly negligent behavior below a reasonable standard of human decency, including but not limited to the conviction, commission, aiding or abetting, attempting, conspiring, or soliciting to commit any of the following:
(a) Murder.
(b) Unjustified intentional killing.
* * *
(h) A felony that has resulted in serious bodily injury.
* * *
(i) Abuse or neglect which is chronic, life threatening, or results in gravely disabling physical or psychological injury or disfigurement.
La. Ch. C. art. 1015(6) states:
Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.
The enumerated elements of La. Ch. C. 1015(6) require: (1) at least a year has passed since the child was removed from *539 the parent; (2) no substantial compliance with the approved case plan; and (3) lack of any reasonable expectation of significant improvement in the parent's conduct in the near future.
Indisputably, the first element has been satisfied as approximately 16 months passed between the initial instanter order on July 3, 2015, and DCFS' filing of the petition for involuntary termination of parental rights on November 16, 2016. The second element, lack of substantial compliance with the case plan, is the most contentious issue in this matter. According to La. Ch. C. art. 1036(C), lack of substantial compliance with the case plan can be shown by one or more of seven circumstances, five of which are relevant here. Those circumstances include:
(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.
The third element of La. Ch. C. art 1015(5) requires the lack of any reasonable expectation of significant improvement in the parent's conduct in the near future and is explained in La. Ch. C. art. 1036(D) as being shown by one or more of:
(1)Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
* * *
(3)Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.
The court looks for a reasonable expectation of reformation, found when the parent has cooperated with state officials and shown improvement; not all existing problems need be eliminated. State in Interest of S.M., 98-0922 (La. 10/20/98), 719 So.2d 445. The court clarified that reformation is more than cooperation with state agencies, but rather a significant, substantial indication of reform, such as significantly modifying the behavior that caused the child's removal from the home. Id.
In its reasons for judgment, the trial court considered the testimony of Vernata Delmore ("Delmore"), a case worker for DCFS. DCFS prepared a case plan for Hammond, which included domains for parenting, housing, income, mental health, substance abuse, visitation, and domestic violence. Delmore, who no longer works for DCFS, testified that while she was Hammond's case worker, Hammond never completed any part of the case plan. As to housing, Hammond had moved several times while the case was pending. After leaving Flowers' home, she initially lived with her parents, next with Brister, and thereafter moved to a house in West Monroe as a roommate with Tammy Jo Hammond. In November 2015, Hammond married *540 Lindsay Hammond ("Lindsay"), who is the daughter of her former roommate, Tammy. Hammond did not inform DCFS of the marriage prior to her family team meeting on December 9, 2015. Hammond and Lindsay moved into a three-bedroom, two-bath home. Delmore testified the home appeared to be located in a quiet neighborhood and had adequate food and utilities; however, Delmore stated the house was likely unsafe for the children because it was located near a snake oxidation pond, and Hammond reported almost being bitten by a snake. Delmore testified Hammond's housing history caused the agency concern because she moves so frequently and appears unstable.
Delmore also expressed concerns with Hammond's temperament and anger issues. According to Delmore, Hammond was a volatile hothead who cursed a lot, lost her composure, and was overly dramatic. Delmore admitted she feared for her own safety at times. On one occasion, Hammond called Delmore names and made threats to blow up the state office building. Delmore's greatest concern was that Hammond's actions and outbursts habitually happened in front of the children, often upsetting them.
When Hammond was not upsetting the children, she was overly showering them with gifts. Delmore testified she routinely supervised the visits between Hammond, N.B., I.B., and P.B. According to Delmore "every visit was like Christmas for the kids." Delmore testified that when observing other parents, she often witnessed the parents assisting the children with homework or discussing their adjustment into a foster home. Delmore stated the only parenting practice she observed with Hammond was Hammond's ability and willingness to provide gifts. Delmore indicated over half of Hammond's visit was spent unwrapping presents and putting toys together. According to Delmore, the interactions between Hammond and the children did not seem sincere, and the gifts were a distraction. Delmore questioned what the children's responses would be when the glamour was gone and every day was not Christmas. Delmore recommended Hammond stop bringing so many gifts and instead do more interactive things with the children; however, Hammond's response was that "those were her damn children and she'll do what she wants with them."
Delmore also testified DCFS amended Hammond's case plan to include her wife, Lindsay. Delmore stated there was concern from the agency about Hammond's failure to disclose Lindsay's extensive criminal history, which includes numerous drug charges, simple battery, issuing worthless checks, simple criminal damage to property, theft, and probation violations. When Delmore voiced her concerns about Hammond's recent marriage to Lindsay and Lindsay's background, Hammond responded that she can "do what the fuck she want to do with her life."
The trial court also considered the testimony of Letoshia Ross ("Ross"), the foster care supervisor for DCFS. Like Delmore, Ross contended Hammond did not successfully comply with any portion of the case plan. Ross admitted Hammond and Lindsay's current housing would be adequate for the children, but for the fact that Hammond moved so much and DCFS was not always aware of whom Hammond resided with.
Ross also discussed Hammond's income and her ability to independently provide for the needs of the children. Hammond currently relies on Lindsay's income. Lindsay receives a monthly income of $5,000 from an inheritance and received a lump sum of approximately $200,000 in 2016. Ross testified she told Hammond that although Lindsay is financially stable, pays *541 the rent on the home, and earns sufficient money to support Hammond and the children, she needed to have her own income instead of relying solely on Lindsay's. Ross suggested Hammond get a job, however, Hammond has yet to do so. Ross also indicated that, as part of Hammond's case plan, Hammond was required to provide $50 per month to help with the needs of the children. Hammond failed to comply with this directive.
Moreover, Ross discussed the agency's concern of whether, due to her mental and physical health, Hammond would be able to appropriately care for the three minor children. Ross testified that during one of the family meetings, Hammond stated she had visited the emergency room hundreds of times in 2016 for various health reasons. DCFS was uncertain if Hammond would be able to physically care for the children with the stomach condition, gastroparesis, and with Hammond being occasionally hospitalized, and her regular visits to the ER. When asked if she believed she would be able to care for the children, Hammond's response was that if she could not care for them, Lindsay could do it, and if Lindsay could not, Lindsay's mother could. Additionally, although Hammond had done specific things outlined in her case plan, Ross worried that Hammond was seeing so many different doctors and she was not advising them of the different medications prescribed by the others. There was one period where Hammond was taking Klonopin, Trazodone, Cymbalta, Seroquel, and OxyContin -all prescribed by different doctors.
As it pertains to the substance abuse aspect of Hammond's case plan, Ross testified that Hammond's drug screens always had a negative result; however, there were issues regarding Hammond's failure to appear for the drug screens on the same day she was requested to do so. Hammond's case plan required her to report to the screening site within 24 hours of receiving a request from DCFS. According to Ross, there were several instances when Hammond showed up past the 24-hour deadline, and provided no legitimate reason for her noncompliance.
Ross also testified about Hammond's treatment with Dr. Beatrice Tatum ("Dr. Tatum"). Hammond began counseling with Dr. Tatum in November 2015 for parenting skills, grief, domestic violence, and anger management. Dr. Tatum informed DCFS that Hammond was cooperative with the case plan, had completed the parenting sessions, and is making progress in other areas of the program. Ross testified that although Dr. Tatum indicated Hammond completed the parenting sessions, Hammond has yet to demonstrate the things she learned in those sessions, particularly Dr. Tatum's suggestions on how Hammond should behave during and after her visits with the children. Ross believed Dr. Tatum's reports were based solely on what Hammond told her she was doing, not what Dr. Tatum personally observed at any of the visits. Ross stated Dr. Tatum believed Hammond was internalizing Dr. Tatum's suggestions and implementing them during her visitations with the children. Ross asserted Dr. Tatum never actually monitored or saw Hammond with the children, so Dr. Tatum had no first-hand knowledge of whether Hammond demonstrated her learned parenting skills, which according to Ross, Hammond did not.
Ross discussed DCFS' concern with Hammond's pending criminal charge for B.B.'s death. Ross stated that one of the requirements of Hammond's case plan is Hammond resolve all criminal matters. The children have already been in DCFS' care for 18 months and Ross worries that prolonging permanency for the children *542 until a decision is made in Hammond's criminal case is unhealthy, and in fact, detrimental for the children.
We find the trial court did not commit manifest error in determining DCFS met its burden of proof by clear and convincing evidence the grounds for which Hammond's parental rights were terminated. First, as it pertains to La. Ch. C. 1015(4), DCFS concluded that based on the autopsy information received on B.B., B.B. died due to neglect and/or abuse. The reports indicated B.B. had severe bruising over her legs, body, upper torso, and extensive inner bruising to the internal areas. During trial, Hammond admitted the children were repeatedly spanked and beaten by Flowers, but denied ever beating the children herself. However, the trial court found Hammond noncredible as a witness, and in fact found her to be rather manipulative and her testimony contrived.
The record reflects that both N.B. and I.B. revealed they were repeatedly beaten by Flowers and Hammond. Dr. Lawanna Gunn-Williams ("Dr. Gunn-Williams"), an expert in the fields of psychotherapy and marriage and family counseling, testified N.B. reported that after Hammond and Flowers would beat them, they would make the children sit in hot water to remove the scars and bruises. Dr. Gunn-Williams also stated that on the day B.B. died, N.B. reported that both Flowers and Hammond had beaten B.B., and he was standing in the corner awaiting his beating. The trial court apparently found the testimony of Dr. Gunn-Williams more credible than that of Hammond. We find the trial court was not clearly wrong in finding Hammond committed acts of misconduct in the form of abuse and/or neglect toward the minor children which likely led or contributed to B.B.'s sad and unfortunate death.
Moreover, the record is replete with evidence indicating Hammond has not substantially complied with her case plan, nor do her actions in any way demonstrate there would be a significant improvement in her condition. As to Hammond's housing requirement, since B.B.'s death, Hammond has failed to secure a safe and stable home for the children to live in. In the year following the minor children's removal by DCFS, Hammond moved at least four times, and DCFS is uncertain as to her current housing situation.
Hammond has also failed to complete the income aspect of the case plan. Hammond continues to rely solely on Lindsay's inheritance payments, despite repeated recommendations and suggestions that she should seek an independent source of income. Essentially, Hammond has no ability to provide for the minor children but through Lindsay. Even more remarkable is, notwithstanding Hammond's assertion of Lindsay's sufficient income, Hammond failed to fulfill the aspect of the case plan which required she contribute $50 per month (not per child) toward the children's foster care.
The record also indicates Hammond failed to show she could appropriately parent the minor children. This is evident by Hammond's frequent cursing and inappropriate outbursts while in the children's presence, as well as her inability to have meaningful interaction with them without distracting the children with the excessive gifts she provides. Even when her case worker suggested she bring fewer gifts, Hammond continued to overpower her visits with gifts and was not receptive to the critique. Additionally disturbing are Hammond's significant health issues that have caused her to make at least 100 emergency room visits in one year. Even more alarming is Hammond's rather dismissive assertion that if she can't care for the children, *543 Lindsay can, and if Lindsay can't, Lindsay's mother will, and so on and so forth. Hammond's willingness to pass her children from one person to the next further demonstrates her inability to effectively and responsibly parent.
However, what is perhaps this Court's greatest concern is the pending second-degree murder case against Hammond, and Hammond's decisions before and after B.B.'s death. Hammond testified she initially moved in with Flowers because he was a family friend and he was willing to help her with the children. Hammond further claimed she stayed with Flowers because he padlocked the doors and prevented her from leaving. Dr. Tatum testified that Hammond told her that while she and the children lived with Flowers, Flowers gave her and N.B. black eyes; made B.B. sit in a cold tub of water for hours if she wet herself; forced N.B. and B.B. to take their clothes off and lie on the floor together; and prevented the children from eating, sometimes two or three days at a time.
The record indicates Hammond facilitated the death of B.B. by either beating her and/or subsequently trying to help Flowers conceal what happened. After exposing her children to such trauma, degradation, abuse, and by allowing them to remain in this abysmal situation, Hammond has now married Lindsay, someone with an extensive criminal history, which includes drug and assault charges, and Hammond continues to support her children's reunification and return to live with her and Lindsay. When faced with criticism about her decision, Hammond's response that she can "do what the fuck she want to do with her life" is clear evidence that Hammond is selfish and her main priority is herself. It is this unchanging mentality and the failure to meaningfully address her self-serving attitude that should prevent any attempts at a successful and healthy long-term reunification with her children. Pursuant to the provisions of La. Ch. C. art. 1036(C), this evidence more than convincingly establishes the lack of any reasonable expectation of significant improvement by Hammond.
Based upon this record, we cannot say the trial court was clearly wrong in finding the state proved with clear and convincing evidence that Hammond has failed to substantially comply with the case plan, or that there is any reasonable expectation that she will improve.
Best Interest of the Minor Children
In addition to finding a statutory ground has been proven, the judge must also find termination is in the best interest of the child under La. Ch. C. art. 1039. See State in Interest of M.L. & P.L. , 95-0045 (La. 09/05/95), 660 So.2d 830, 832.
While a parent has a natural fundamental interest in the continuing companionship, care, and custody of their children, the child has a profound interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term and continuous relationships found in a home with proper parental care. La. Ch. C. art. 1001 ; State ex rel. J.T. , 46,174 (La. App. 2 Cir. 03/02/11), 58 So.3d 1015.
In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. State ex rel. G.J.L. , 00-3278 (La. 06/29/01), 791 So.2d 80 ; State ex rel. A.R.H. v. Hines , 35,800 (La. App. 2 Cir. 02/27/02), 810 So.2d 1166. In all proceedings, when a ground justifying termination of parental rights is proven, the primary concern is to secure the best interest of the child. Id. The focus of an involuntary termination proceeding is not whether the parent should be deprived *544 of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. Id.
Children have the right to live in a safe, secure environment and to be reared by someone, who is capable of caring for them. Indubitably, children have a need for permanency. As the Supreme Court has previously noted, this need has been recognized on both a federal and state level. State ex rel. H.A.B. , 2010-1111 (La. 10/19/10), 49 So.3d 345, 370.
Hammond allowed N.B., I.B., P.B., and B.B. to endure incomprehensible situations. She also partook in these horrific incidents of abuse and neglect toward her children. Dr. Gunn-Williams testified that N.B., the oldest child, has unresolved issues and questions concerning why Hammond never helped him, but instead would assist Flowers in inflicting abuse upon him. Dr. Gunn-Williams stated, as a result of the physical and emotional abuse, N.B. has developed complex post-traumatic stress disorder. N.B. has a fear of Hammond, Flowers, and of being removed from his foster home. Dr. Gunn-Williams opined that moving N.B. in with Hammond at this stage would be detrimental for N.B.
Furthermore, Hammond still has a second degree murder charge pending against her for the death of B.B. Despite her certainty that she will be acquitted, that remains to be seen. In the interim, the children have been in foster care since July 2015, and they are thriving in the home of their foster parent. When questioned about the children and whether they were thriving in their foster home, Delmore testified that the last time she was in contact with the children, they were safe and being excellently cared for in the home of their foster parent, who has indicated she would like to adopt all three of the children. Delmore informed the juvenile court that she has never been more satisfied with child placements than in this case and that all of the children's needs are being met. These children deserve stability and permanency, something Hammond has yet to provide them. Termination of Hammond's parental rights was clearly in the best interest of the children, and the trial court's determination was not in error.
Restrictions on the role of co-counsel
In her last assignment of error, Hammond argues the trial court abused its discretion in restricting the role of her co-counsel during trial. Hammond contends the restriction needlessly limited the representation she received and violated her right to counsel.
The United States Supreme Court has recognized that there is a presumption in favor of a party's right to choose counsel. Wheat v. United States, 486 U.S. 153, 158, 160, 108 S.Ct. 1692, 1696, 1697-1698, 100 L.Ed.2d 140 (1988). In civil matters as well as criminal matters, the right to counsel includes the right to legal representation of one's choice. McCuin v. Texas Power, 714 F.2d 1255, 1257 (5th Cir. 1983). This right is "one of constitutional dimensions and should be freely exercised without impingement." The right to counsel of choice is not absolute. Id. at 1262, 1263. This right can be overridden only if it can be proven that there is a compelling reason to do so. Id.
The Louisiana Supreme Court has consistently held that this right cannot be manipulated to obstruct the orderly procedure of the courts and cannot be used to interfere with the fair administration of justice. State v. Champion, 412 So.2d 1048, 1050 (La. 1982) ; State v. Johnson, 389 So.2d 1302, 1304 (La. 1980) ; State v. Jones, 376 So.2d 125, 129 (La. 1979) ; State v. Lee, 364 So.2d 1024, 1028 (La. 1978) ;
*545 State v. Anthony, 347 So.2d 483, 487 (La. 1977). In order for a trial court's ruling on a defendant's right to counsel to be upset, there must be a showing of clear abuse of discretion. State v. Ventris , 10-889 (La. App. 5 Cir. 11/15/11), 79 So.3d 1108, 1119.
Cameron Murray ("Murray"), Hammond's attorney in her second degree murder case, filed a supplemental motion to enroll as co-counsel in the termination proceedings. In the supplemental motion, Murray asserted that because the termination of rights matter would involve significant issues of criminal law, his experience in the area of criminal defense would be necessary to protect Hammond's interests. Murray also stated his role would be to assist lead counsel, Jan P. Christiansen ("Christiansen"), in areas of the trial where knowledge of criminal law are crucial. The trial court granted Murray's motion for the limited purpose of assisting Christiansen in the areas of the trial where knowledge of criminal law are crucial and only to the extent that Murray's representation did not conflict with existing trial dates. Murray subsequently filed a second supplemental motion requesting he be allowed to enroll without any limitations. The trial court denied the second supplemental motion and noted Murray's initial motion was granted for limited purposes, as Murray originally requested.
We find the trial court acted within its discretion in limiting the role of Murray. There is no evidence Hammond was denied the right to counsel at any stage in the proceeding nor is there any evidence that Hammond's right to counsel was denied by any limitations requested by and imposed on co-counsel. This assignment of error is without merit.
CONCLUSION
For the reasons stated herein, we affirm the trial court's denial of Clarissa H. Hammond's motion to recuse. Additionally, we affirm the decision of the trial court in favor of the Department of Children and Family Services, and against Clarissa H. Hammond, terminating her parental rights as to the three minor children, N.B., I.B., and P.B. Finally, we affirm the trial court's decision to deny Clarissa Hammond's second supplemental motion to enroll. All costs of this appeal are assessed to appellant, Clarissa Hammond.
AFFIRMED.

Pursuant to URCA 5-1 and 5-2, the initials of the children are used to protect the minor children's identity.

This Court affirmed that judgment in State of La. in the Interest of N.B., I.B., and P.B. , 51,374 (La. App. 2 Cir. 02/15/17), 215 So.3d 398.