Judgment rendered October 2, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,914-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

RANDY DESHAY GRAHAM                          Plaintiff-Appellee

versus

SONJA TURNAGE GRAHAM                         Defendant-Appellant
JOHN RANDALL GRAHAM

* * * * *

Appealed from the
Fifth Judicial District Court for the
Parish of Franklin, Louisiana
Trial Court No. 48173B

Honorable Will Barham, Judge

* * * * *

LAW OFFICES OF DAWN H. MIMS              Counsel for Appellant,
By:  Dawn Hendrix Mims                   Sonja Turnage Graham

CUMMINS AND FITTS, LLC                   Counsel for Appellee,
By: Jessica Leigh Fitts                  Randy DeShay Graham

HOGGATT LAW, LLC
By:  Eric Micah Hoggatt

* * * * *

Before STONE, THOMPSON, and MARCOTTE, JJ.

**STONE, J.**

This appeal arises from the Fifth Judicial District Court, the Honorable Will Barham presiding. Randy G. Graham ("Randy") is the plaintiff; he initiated the proceedings with a petition for partition, breach of contract, specific performance, and damages against the defendants, Sonja T. Graham ("Sonja") and John R. Graham ("John"). Randy is John's father. Sonja and John are former husband and wife who were amid post-divorce litigation as of the time of rendition of the judgment herein appealed.

## FACTS AND PROCEDURAL HISTORY

The subject of the dispute is a horse allegedly co-owned by all three parties. Sonja and John purchased the horse as a colt in 2015 for $1,500 in the hope that he would be profitable as a barrel racing horse and as a stud (breeding horse). However, far more was expended for the horse's training and maintenance than they collected in winnings, and the horse was diagnosed with bleeding lung disease and has a clubfoot.

Randy's basis for his claims is an alleged oral contract that was partially memorialized in a document referred to as the "September 12, 2019, Cash Deed." Therein, Randy and Sonja "declared that they are joint owners of a horse named Parkerscanman…in proportion of 51% to Sonja Graham and 49% to Randy Graham," and further declared that "they shall split all monies earned by the horse in proportion of 51% to Sonja Graham and 49% to Randy Graham." This document, Randy claims, is proof of his 49% ownership interest via the antecedent oral agreement whereby Randy would cause his business, Graham's Auto Body ("GAB"), to pay roughly $10,000 to have the horse trained in exchange for the transfer of a 49% ownership interest in the horse.

In her answer and reconventional demand, Sonja claimed that she is the sole owner of the horse,[1] and that she signed the Cash Deed under duress. Alternatively, she asserted her entitlement to reimbursement for her expenditures for maintaining and training the horse (i.e., if the court recognized John and/or Randy as co-owner of the horse). Sonja named both Randy and John as defendants-in-reconvention.[2] John has not filed any pleadings.

The trial (a bench trial) took place on October 18, 2023. The court received evidence including multiple exhibits and live testimony from the three parties. After trial on October 18, 2023, the court ruled from the bench. In a judgment signed on October 20, 2023, the district court granted Randy a "right of first refusal" to purchase a 100 % interest in the horse for $1,500, and *alternatively*, ordered that the horse be sold via sheriff's auction (i.e., if Randy did not purchase it via his aforementioned right). The judgment further ordered that if the horse were to be sold by public auction, the proceeds would be distributed 49% to Randy, 25.5% to Sonja, and 25.5% to John.[3] Finally, the judgment dismissed all claims for reimbursement by all parties.

Sonja filed this appeal urging that the trial court erred in: (1) finding that there is a valid contract or other means of transferring an undivided

---

[1] Discussion reflected in the trial transcript indicates that the trial court initially set aside the issue of whether the horse is former community property or was Sonja's separate property since the purchase was in 2015. Sonja testified that the funds used to pay for the purchase of the horse came from a line of credit on real estate that she inherited from her mother. John testified that the money used to purchase the horse came from his joint account with Sonja, but he did not remember the source of the money in that account at the time of the horse purchase.

[2] As to John, this technically should be referred to as a cross claim.

[3] This implicitly reflects a finding that the horse is part of John and Sonja's former community patrimony.

interest in the horse to Randy; (2) denying Sonja's claims for reimbursement; (3) ordering private sale when no party had prayed for such; (4) granting Randy the sole right to purchase the horse in the private sale; (5) setting the value/price of the horse at $1,500 without any testimony regarding its value; (6) commenting on testimony, asking leading questions of the witnesses, "overtly favoring Randy and John," and considering evidence not in the record; (7) failing to set a suspensive appeal bond without a hearing; (8) ordering the immediate transfer of the horse to Randy's custody despite Sonja's suspensive appeal; and (9) signing the judgment in less than 48 hours in violation of Uniform District Court Rule 9.5.

## EVIDENCE INTRODUCED AT TRIAL

Below, the evidence is outlined topically in the following order: (1) evidence regarding the existence and validity of the alleged contract transferring an undivided interest in the horse to Randy; (2) evidence of contractually agreed particulars, if any, concerning the purpose, management, revenues, and expenses of the horse; and (3) evidence regarding Sonja's reimbursement claim, and Randy's defenses thereto. (Evidence regarding the other assignments of error appears in context under these three headings).

***Contractual transfer of undivided interest to Randy***. John testified that he, Sonja, and Randy orally agreed that Randy would "pay for so much [of the horse's] training and he would own 49% of the horse." Thereafter, beginning in March of 2018, the horse went to stay with three successive trainers: Joey Coleman, then Bo Stewart, then Lily Jeffers. Through checks

3

drawn on an account of GAB,[4] Randy paid these various trainers monthly amounts ranging from $800 to $950 for 18 months. Randy asserted that the total payments amounted to $9,850, and Sonja admitted that this was true. On September 12, 2019, Randy and Sonja executed the Cash Deed, and Randy made no such payments afterwards. Sonja argues that she signed the Cash Deed under duress because John threatened that, unless she signed it, he would not grant her an uncontested divorce.

*Agreed purpose and management of the horse*. Sonja testified that she was going to be the main rider of the horse, and that she was the only one besides the trainers who rode the horse. Randy (and John) admitted that, at the time of the oral agreement, the common intent of the parties was that the horse would be under the management, care, and custody of the trainers, and would serve as an investment, not a pet.[5] Sonja testified that the agreement was that the horse would go to Future Fortune Fortuity runs, and that he did complete those.

Despite being listed as an exhibit, there is no exhibit D-12 in the record, but it was discussed in Sonja's testimony and then withdrawn as Sonja explained that she loves barrel racing and it is a hobby of hers.

On its own motion, the court called Randy back to the witness stand, and he stated that he loves quarter horses and has owned at least one for the

---

[4] Randy testified that he and his wife were the only owners of this business. These checks were not introduced into evidence.

[5] In the divorce proceedings, the trial court issued an injunction prohibiting alienation of community assets, and Sonja indicated that she was thereby bound to keep the horse. In October of 2021, the horse was diagnosed with bleeding lung disease, but Sonja kept running him in competitions, albeit on a more limited basis. Randy explained that this causes the horse to bleed inside his lungs when he exerts himself, which impairs his breathing. Randy further stated that this "don't amount to a hill of beans" because it can be treated successfully with medication (called "Lasix") and is a common ailment for horses. Sonja also stated that the horse has a clubfoot. On February 27, 2023, the district court issued an order prohibiting the horse's "engagement in any hazardous behavior or contests" and ordered a veterinary examination by Dr. Chris Sullivan.

last 40 years and has 26 acres of pasture and was currently in custody of another horse there.

***Agreement regarding revenues and expenses***. Randy also testified that the agreement was that he would receive his payment out of the *gross* winnings (i.e., before the payment of any expenses out of those proceeds), *and that he would have no further responsibility for the expenses of the horse*. Randy testified that the oral agreement was that Sonja was to bear the full cost of expenses associated with each competition — such as travel, boarding, and entry fees. Randy admitted that Sonja paid all the horse's expenses after the signing of the Cash Deed. John stated that, prior to the divorce, expenses for the horse (besides training) were paid from his joint account with Sonja. Sonja insisted that John and Randy were fully aware of how much she was spending on the horse after the signing of the Cash Deed in connection with her divorce from John.

***Reimbursement; use and enjoyment.*** In support of her reimbursement claim (which totals approximately $55,000), Sonja testified that she spent approximately $70,000 on the care and maintenance of the horse, including veterinary bills, boarding fees, rodeo entry fees, and training fees. Randy testified that he had no "use" of the horse and had not seen the horse in 4½ years as of the time of trial. Additionally, Randy admitted that the horse had been in Sonja's pasture for the year preceding the trial, that he had not asked her for permission to go and see it,[6] and that nobody otherwise prevented him from seeing or using the horse. (Likewise,

---

[6] In connection with this line of questioning, the trial judge indicated that, based on evidence from a separate suit (i.e., the John-Sonja divorce and custody litigation; the divorce occurred in 2020), he was aware of Randy and John's acrimonious relations with Sonja.

John admitted there were no court orders preventing him from going to see the horse). Randy also admitted that he cannot ride a horse.

Sonja further testified that she paid Lily Jeffers and Bo Stewart for the horse's training. Exhibit D-3 was introduced in globo over Randy's objection (that he had asked for it in discovery and not received it). The exhibit reflects expenditures Sonja made toward the horse's training after the September 19, 2019, execution of the Cash Deed.[7]

Exhibits D-4 through D-11 were admitted over Randy's objection on the basis of hearsay and lack of authentication.[8] Sonja, on direct examination, stated that these records were not created for the purpose of litigation, but were "just…[her] documents and what…[she] keeps up with on a horse." This prompted counsel to ask if they were "business records," which Sonja affirmed. However, on cross-examination, Sonja admitted that she compiled these records for the purpose of the trial, and she had kept track of these expenses for purposes of litigation.

---

[7] These include: (1) monthly invoices from Bo Stewart to Sonja for August, October, November, and December of 2019; (2) copies of checks drawn on Sonja's account; (3) a screenshot of a text message to "Lily" asking for PayPal info, a response: "lilynorris1@gmal.com," and a screenshot within the screenshot of a PayPal screen saying $1,200 paid to Lily Jeffers; (4) a screenshot of a PayPal history reflecting payments to "Lily Jeffers" (days and months are indicated but not years); (5) a checking account activity log from October 28, 2019, to November 25, 2019. Three of these checks are payable to Bo Stewart: (i) no. 4015 for $950 dated September 19, 2019; (ii) no. 4017 for $600 on September 20, 2019; (iii) no. 4028 on October 28, 2019, for $1210. Also, (iv) no. 4031 on December 3, 2019, to "Old Ford Days Fortuity" for $225. (The checking account activity log notes that check no. 4028 was paid on November 19, 2019).

[8] In connection with exhibit D-6, Randy made his objection to Sonja's exhibits universal, so he would not "have to keep popping up." The trial court accepted this and noted Randy's objection as to each subsequent exhibit.

## LAW AND ANALYSIS

**Contract**

Sonja argues that Randy has no ownership interest in the horse because: (1) within the four corners of the Cash Deed, there exists no valid sale[9] or donation inter vivos; and (2) she signed the Cash Deed under duress because John said he would not otherwise grant her an uncontested divorce.

"A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." La. C.C. art. 1906. "A contract is onerous when each of the parties obtains an advantage in exchange for his obligation." La. C.C. art. 1909. "Nominate contracts are those given a special designation such as sale, lease, loan, or insurance. Innominate contracts are those with no special designation." La. C.C. art. 1914.

"A contract is formed by the consent of the parties established through offer and acceptance." La. C.C. art. 1927. The irreducible minimum for an enforceable contract consists of the following four elements: (1) at the time of formation of the contract, the parties must possess the *capacity* to contract; (2) the parties must freely give mutual *consent* to the contract, which is established through offer and acceptance;[10] (3) the contract must

---

[9] She alternatively argues that even if the agreement constituted an otherwise valid sale, it was invalid as a simulation pursuant to La. C.C. art. 2480 because possession of the horse remained with her after the alleged sale. This article, however, does not contemplate the sale of a mere undivided interest in an investment property.

[10] La. C.C. art. 1940 determines when an offer can only be accepted by complete performance; it states:

> When, according to usage or the nature of the contract, or its own terms, an offer made to a particular offeree can be accepted only by rendering a completed performance, the offeror cannot revoke the offer, once the offeree has begun to perform, for the reasonable time necessary to complete the performance. The offeree, however, is not bound to complete the performance he has begun. The offeror's duty

have an *object* that is lawful, possible, and determinable; and (4) the contract must have a lawful *cause*.[11] La. C.C. arts. 1918, 1927, 1966, 1971; *Granger v. Christus Health Cent. Louisiana*, 12-1892 (La. 6/28/13), 144 So. 3d 736, 760–61. There is no contract unless both parties are bound. *Keller v. Sisters of Charity of Incarnate Word,* 597 So. 2d 1113 (La. App. 2 Cir. 1992).

Additionally, for certain types of contracts, the law imposes form requirements. "Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent." La. C.C. art. 1927.

There is no legally required form for the transfer of an undivided interest in a corporeal movable (such as a horse) by onerous contract. "When a writing is not required by law, a contract not reduced to writing…for price or value…in excess of five hundred dollars…must be proved by at least one witness and other corroborating circumstances." La. C.C. art. 1846. Thus, the courts have recognized that, in the absence of a form requirement imposed by law, an oral agreement may immediately create an enforceable contract even though the parties intended that it would later be memorialized in writing.[12] *Crowe v. Homesplus Manufactured Hous., Inc.*, 38,382 (La. App. 2 Cir. 6/21/04), 877 So. 2d 156, 161–62.

---

of performance is conditional on completion or tender of the requested performance.

[11] "An obligation may be valid even though its cause is not expressed." La. C.C. art. 1969.

[12] Generally, a donation inter vivos must be in the form of an "authentic act." La. C.C. art. 1541. La. C.C. art. 1833 defines authentic act as "a writing executed before a notary public…in the presence of two witnesses, and signed by each party who executed it, by each witness, and by each notary public before whom it was executed."

Consent to a contract "is vitiated when it has been obtained by duress of such a nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property, or reputation." La. C.C. art. 1959. However, "[a] threat of doing a lawful act or a threat of exercising a right does not constitute duress." La. C.C. art. 1962.

La. C.C. art. 1831 allocates the burden of proof regarding contracts in litigation as follows:

> A party who demands performance of an obligation must prove the existence of the obligation.
> A party who asserts that an obligation is null, or that it has been modified or extinguished, must prove the facts or acts giving rise to the nullity, modification, or extinction.

Louisiana's parol evidence rule is codified in La. C.C. art. 1848:

> Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature. Nevertheless, in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent or to prove that the written act was modified by a subsequent and valid oral agreement.

"The determination of the existence of a contract is a finding of fact, not to be disturbed unless clearly wrong," i.e., manifestly erroneous. *Crowe, supra.* The Louisiana Supreme Court "has stated a two-part test for the reversal of a factfinder's determinations: 1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and 2) the appellate court must further determine that the record establishes that the finding is clearly wrong or manifestly erroneous." *Read v. Willwoods Cmty.*, 14-1475 (La. 3/17/15), 165 So. 3d 883, 888. It is the appellate court's role to review the judgment, not the reasons for the judgment. *Wooley v. Lucksinger*, 09-0571 (La. 4/1/11), 61 So. 3d 507,

9

572.[13] Therefore, provided evidence in the record supports the judgment, the appellate court may affirm the judgment even though the trial court's reasoning was erroneous.

The trial court's allowance of testimonial evidence of the agreement did not violate La. C.C. art. 1848 because the testimony did not "negate or vary" the terms of the Cash Deed. Moreover, the combination of John's testimony, Randy's testimony, and the Cash Deed (which Sonja admitted to signing) was sufficient to prove that the parties agreed that Randy would receive a 49% interest in the horse in exchange for causing GAB to pay for approximately $10,000 in training expenses, and that Randy performed his obligation under that agreement. The trial court did not commit manifest error in finding that the parties made such an agreement. Nor did the trial court commit legal error in finding that the agreement was an enforceable onerous contract.

Sonja's remaining arguments are also erroneous. First, a "sale" is not the only type of contract by which an undivided interest can be transferred; an innominate contract—such as we have here—may validly do so. This is the bedrock principle of freedom of contract. Second, because the agreement was an enforceable onerous contract, the failure to properly execute the authentic act is without effect. Third, John's "threat" that he

---

[13] The Wooley court explained:
> The district court's oral or written reasons for judgment form no part of the judgment, and…appellate courts review judgments, not reasons for judgment. Appeals are taken from the judgment, not the written reasons for judgment. Judgments are often upheld on appeal for reasons different than those assigned by the district judges. The written reasons for judgment are merely an explication of the trial court's determinations. They do not alter, amend, or affect the final judgment being appealed. (Internal citations and quotation marks omitted).

*Id.*

10

would not grant Sonja an uncontested divorce if she refused to sign the Cash Deed[14] amounts to a threat to exercise his legal right, and therefore, did not and could not cause duress sufficient to vitiate her consent to the agreement. La. C.C. art. 1962. Furthermore, Sonja had already consented to and accepted the benefits of the contract *before* this supposed duress existed: thus, even if John's "threat" could constitute duress (which it cannot), it still could not *retroactively* invalidate Sonja's consent given long beforehand.

Finally, Sonja argues that, because Randy only paid $9,850 (instead of $10,000) there was no contract ever formed. This argument conflates contract formation with performance of Randy's contractual obligation. There is nothing in the record that would require the trial court to find that the parties agreed that the transfer to Randy would only occur upon his payment of exactly $10,000.[15]

Because Randy is a co-owner of the horse, he has the right to pursue partition in accordance with the law.

**Partition**

La. C.C. art. 807 establishes a co-owner's right to partition, and the exceptions thereto:

> No one may be compelled to hold a thing in indivision
> with another unless the contrary has been provided by law
> or juridical act.
> Any co-owner has a right to demand partition of a thing
> held in indivision. Partition may be excluded by agreement
> for up to fifteen years, or for such other period as provided
> in R.S. 9:1702 or other specific law.

---

[14] The Cash Deed was not executed until Randy completed performance of his obligation, i.e., more than a year after they entered the agreement.

[15] There is a lack of evidence that Sonja and John were the offerors and made the offer subject to a stipulation that it that could only be accepted via Randy's complete performance. Nor is there evidence of the agreement making Randy's complete performance a suspensive condition of the transfer. La. C.C. art. 1940 is inapplicable.

11

La. C.C. art. 811 provides for public auction or private sale as means of partitioning a thing, such as a live rodeo/stud horse, which cannot be physically divided among the co-owners:

> A. When the thing held in indivision is not susceptible to partition in kind, the court shall decree a partition by licitation or as provided in Paragraph B of this Article, by private sale and the proceeds shall be distributed to the co-owners in proportion to their shares.
> B. *In the event that one or more of the co-owners…have not consented to a partition by private sale, the court shall order a partition by private sale and shall give first priority to the private sale between the existing co-owners*, over the sale by partition by licitation or private sale to third parties. The court shall order the partition by private sale between the existing co-owners…The petition for partition by private sale…shall be executed under Title IX of Book VII of the Code of Civil Procedure [i.e., articles 4601 *et seq.*] (Emphasis added).

As directed by La. C.C. art. 811(B), the sale process is governed by the Code of Civil Procedure. La. C.C.P. art. 4605, in relevant part, states: "[I]f the…plaintiff is entitled to a partition of the property, the court shall appoint a notary to make the partition in accordance with law." Furthermore, "the court has discretion to direct the manner and conditions of effecting the partition, so that it will be most advantageous and convenient to the parties." *Id*.

Among other things,[16] La. C.C.P. art. 4607 requires that the price in a private sale be at least equal to the appraised value:

> When a partition is to be made by licitation, the sale shall be conducted at public auction and after the advertisements required for judicial sales under execution. *When a partition is to be made at private sale without the*

---

[16] The article further provides that "documents required pursuant to a court order shall be executed on behalf of the…nonconsenting co-owner by a court-appointed representative, who may be a co-owner, after the advertisements required for judicial sales under execution are made. All counsel of record…shall be given notice of the sale date."

*consent of all co-owners, the sale shall be for not less than the appraised value of the property…*(Emphasis added).

La. C.C.P. art. 4614 allows a co-owner to purchase the thing in the partition:

> A. Any property or interest in the property sold to effect a partition, whether by licitation or by private sale, may be purchased by a co-owner.
> B. If a property or interest in the property is purchased by a co-owner, the co-owner shall be credited for his share of the property or interest in the property. The co-owner shall have his share deducted from the purchase price of the property or interest in the property prior to payment.

Lastly, "a final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, *even if the party has not demanded such relief in his pleadings* and the latter contain no prayer for general and equitable relief." La. C.C.P. art. 862. (Emphasis added).

La. C.C. art. 811(B) mandates that the trial court partition the horse by private sale among the co-owners if feasible. Sonja's argument — i.e., that, because Randy did not specifically pray for private sale, the court could not order private sale — is meritless. La. C.C. art. 811(B); La. C.C.P. art. 862.

However, the trial court had no authority to set the price of the sale by fiat. La. C.C.P. art. 4607 unambiguously requires that the horse be appraised, and that the price equal or exceed the appraised value. Nor did the trial court have any authority to grant Randy a right of first refusal in regard to the sale. In these aspects of the judgment, the trial court erred.

**Sonja's claims for reimbursement**

Sonja seeks recovery of Randy's share of the expenses for the necessary expenses of the horse that she incurred after the execution of the Cash Deed in September of 2019. Randy counters Sonja's reimbursement claim by arguing: (1) that the oral agreement negates his liability for

13

reimbursement; (2) pursuant to the second paragraph of La. C.C. art. 806, that Sonja had exclusive use and enjoyment of the horse during the entire period of co-ownership between them, and therefore, she is barred from obtaining reimbursement; and (3) that Sonja's claims were supported only by her own cost summaries, not receipts from third parties.

"Ownership of the same thing by two or more persons is ownership in indivision," i.e., co-ownership. La. C.C. art. 797. "A co-owner may without the concurrence of any other co-owner take necessary steps for the preservation of the thing that is held in indivision." La. C.C. art. 800. "The use and management of the thing held in indivision is determined by agreement of all the co-owners." La. C.C. art. 801. "Except as otherwise provided in Article 801, a co-owner is entitled to use the thing held in indivision according to its destination, but he cannot prevent another co-owner from making such use of it." La. C.C. art. 802. "When the mode of use and management of the thing held in indivision is not determined by an agreement of all the co-owners and partition is not available, a court, upon petition by a co-owner, may determine the use and management." La. C.C. art. 803.

La. C.C. art. 806 establishes the respective co-owner's rights and obligations of reimbursement for expenses incurred in maintaining the co-owned property:

> A co-owner who on account of the thing held in indivision has incurred necessary expenses, expenses for ordinary maintenance and repairs, or necessary management expenses paid to a third person, is entitled to reimbursement from the other co-owners in proportion to their shares.
> If the co-owner who incurred the expenses had the enjoyment of the thing held in indivision, his

reimbursement shall be reduced in proportion to the value
of the enjoyment.

It must be determined whether La. C.C. art. 806 is imperative or

suppletive. The Louisiana Supreme Court has previously explained:

Statutory rules may be either imperative or
suppletive. Rooted in public policy considerations, an
imperative rule is applied without regard to the intention
of the individuals concerned…A suppletive rule, on the
other hand, applies only if those affected by it have not [by
agreement] excluded its application...Thus, distinction
between imperative and suppletive rules determines
whether private individuals can set aside rules established
by the legislature and regulate their legal relations by
private agreement. If an agreement contravenes an
imperative rule, it is absolutely null; thus, it is not subject
to ratification and may be annulled in judicial proceedings
instituted by any interested party.

*E. L. Burns Co. v. Cashio*, 302 So. 2d 297, 300 (La. 1974).  We hold that La.

C.C. art. 806 is a suppletive rule.  There is no public policy reason that co-

owners be denied the contractual freedom to allocate and apportion expenses

as they see fit.

All three parties agreed in their testimony that the purpose of the horse

was financial investment: he was not purchased to be a pet.  Therefore, the

trial court erred in holding that Sonja's custody of the horse constituted

"exclusive use and enjoyment" of him that would preclude her from

obtaining reimbursement pursuant to La. C.C. art. 806.  Because the agreed

purpose of the horse was to seek financial returns, whatever personal

enjoyment or use Sonja may have derived from custody of the horse was

incidental and irrelevant.  Furthermore, John and Randy admitted that

neither court order nor Sonja had prevented them from going to visit the

horse while he was in Sonja's custody; rather, they failed to request such a

15

visit. Sonja's custody of the horse was not "exclusive," and does not preclude her claim for reimbursement.

However, Randy unequivocally testified that the oral agreement was that he would bear no liability for the expenses of the horse beyond the payments to the trainers of approximately $10,000. Neither John nor Sonja contradicted Randy on this point. (Sonja merely suggested that Randy and John were aware of how much she was spending on the horse because they had horses themselves, and they authorized the training with Lily Jeffers after the execution of the Cash Deed). Accordingly, the trial court could have validly denied Sonja's reimbursement claim *against Randy* on this ground. The judgment denying Sonja's reimbursement claim *against Randy* is supported by evidence — upon which a reasonable factfinder could conclude the parties excluded reimbursement claims against Randy — and therefore, is not manifestly erroneous.

However, because the trial court judgment correctly recognizes John as a 25.5 percent owner, Sonja's reimbursement claim against John remains viable. Sonja testified that the funds used to purchase the horse were proceeds of a line of credit secured by property she inherited from her mother but admitted that the loan proceeds went into her and John's joint checking account. John agreed that the funds used to buy the horse came from their joint account, but did not remember the source (or sources) of the funds in the joint account at the time they bought the horse.

Any property in the possession of either spouse during the existence of the community regime is presumed to be community property, but either spouse may prove it is separate property. La. C.C. art. 2340. Likewise, La. C.C. art. 2361 provides, "[e]xcept as provided in La. C.C. art. 2363, all

16

obligations incurred by a spouse during the existence of a community property regime are presumed to be community obligations." In relevant part, La. C.C. art. 2363 states:

> A separate obligation of a spouse is one incurred by that spouse prior to the establishment of a community property regime, or one incurred during the existence of a community property regime though not for the common interest of the spouses or for the interest of the other spouse.

"[P]roperty acquired by a spouse by inheritance" is that spouse's separate property. La. C.C. art. 2341. Property acquired with separate property is separate property. *Id.* The trial court's classification of property as separate or community is subject to manifest error review. *Glover v. Preece,* 54,198 (La. App. 2 Cir. 3/9/22), 335 So. 3d 495.

The trial court did not err in holding that Sonja failed to rebut the presumption that the horse was part of the community patrimony. Sonja did not testify that the line of credit was a separate obligation. Even if it is assumed that the debt was secured by Sonja's separate property, that would not make it manifest error for the trial court to find that Sonja failed to rebut the presumption of community as to the horse and/or the debt. La. C.C. art. 2363. Assuming that John and Sonja are validly divorced, the horse is now former community property.

In the interest of judicial economy, we decline to consider Sonja's reimbursement claim against John for expenses of the horse. This claim should be resolved in the partition of the former community of acquets and gains as part of their post-divorce proceedings.

**Custody of horse pending appeal**

Sonja argues that the trial court erred in ordering that the horse be immediately transferred to Randy's custody pending the partition. "When the mode of use and management of the thing held in indivision is not determined by an agreement of all the co-owners and partition is not available, a court, upon petition by a co-owner, may determine the use and management." La. C.C. art. 803.

This article *a fortiori* authorizes a court to "determine the use and management" of the co-owned thing while judicial partition is pending litigation. Sonja has not established that the trial court abused its discretion in transferring physical custody to Randy pending the partition.

**Suspensive appeal bond**

Sonja alleges that the trial court intentionally delayed this appeal in not setting the suspensive appeal bond without first having a hearing on the matter. She points out that the horse was already placed in Randy's custody pursuant to court order from the signing of judgment onward. This is a moot issue. There simply is no remedy this court could grant. We cannot reverse the judgment due to a delay in setting the suspensive appeal bond.

**Conduct in the trial**

Sonja argues that the trial court abused its discretion "with his interruptions of questioning the witnesses, trying to explain witnesses' testimony and lead witness testimony, overtly favoring of Randy and John Graham, and considering facts not in evidence in this case." Sonja did not, however, move for mistrial or recusal of the trial judge. She points out five particular instances as the basis for this assignment of error:

1. The trial judge stated that it was he who suggested Randy had agreed specifically to the $10,000 amount toward training the horse, when in fact Randy himself said it was $10,000 and admitted he only paid $9,850.
2. The trial judge asked Randy if he "felt" he owed Sonja restitution, while Randy's feelings on the matter are legally irrelevant.
3. The trial judge apologized to Randy "for having to go through this," when Randy was the plaintiff who initiated the litigation.
4. Randy claimed that he would be arrested if he went to Sonja's pasture to see the horse. Sonja's counsel impeached this claim by asking if he had ever called Sonja to ask about seeing the horse; Randy admitted he had not. The trial judge resuscitated Randy's testimony with leading questions after Randy admitted he had no basis for this claim, suggesting that what Randy was really trying to say was that because of Sonja's hostility, it was more trouble than it was worth. The trial court further indicated that he believed Sonja was hostile because of a conversation he had with Sonja and John's minor son during the child custody case.
5. When Sonja's counsel was cross examining Randy regarding why he asserted that Sonja was in breach of contract, the trial court interrupted and instructed Randy that he did not have to couch his answers in legal terminology. (Context indicates Randy did not understand when counsel cross examined him using legal terminology).

"The court has the power to…control the proceedings at trial, so that justice is done." La. C.C.P. art. 1631. "The court may question witnesses." La. C.E. art. 614(B). Furthermore, the jurisprudence recognizes greater latitude in bench trials:

> [I]n a bench trial, as in this one, the dangers inherent in questions from the bench are greatly mitigated because there is no jury to confuse or mislead. The trial judge was merely enabling himself to better understand the crucial testimony of the claimant.

*Martinez v. Martinez*, 17-74 (La. App. 3 Cir. 10/4/17), 228 So. 3d 764, 769.

"The extent to which a trial judge may appropriately and reasonably interrogate witnesses is largely in the sound and unabused discretion of the trial judge." *Martin v. Cotton's Pest Aid Control of Baton Rouge, Inc.*, 424 So. 2d 1216, 1218 (La. App. 1 Cir. 1982).

19

Additionally, a trial judge's improper commentary on evidence at trial may serve as grounds for reversal if the comments themselves had such prejudicial effect as to deprive the party of a fair trial. *Franks v. State Nat'l Ins. Co.*, 22-169 (La. App. 3 Cir. 1/25/23), 355 So. 3d 1174, 1185, *writ denied*, 23-00259 (La. 4/18/23), 359 So. 3d 512. *Franks* addressed judicial comments in in a *jury* trial.

In the context of a *bench* trial, the main potential prejudice, if any, would presumably be the alteration of the testimony presented by suggesting to the witness what to say. In *Aycock v. City of Shreveport*, 535 So. 2d 1006, 1012 (La. App. 2 Cir. 1988), *writ denied*, 536 So. 2d 1223 (La. 1989), this court held that a trial court's "unnecessary" comments on evidence, and reference to testimony from a different case, was not prejudicial and therefore did not rise to the level of reversible error. Notably, *Aycock* involved a bench trial, not a jury trial.

As previously explained, regardless of whether the trial judge is biased, a judge's comments and interrogation of witnesses may deprive a party of a fair trial and thus warrant reversal. However, the judge's *bias itself* is a distinct ground for relief, which must be asserted through a timely, written motion to recuse. La. C.C.P. art. 151(A)(4) mandates recusal if:

> The judge is biased, prejudiced, or interested in the cause or its outcome or biased or prejudiced toward or against the parties or the parties' attorneys or any witness to such an extent that the judge would be unable to conduct fair and impartial proceedings.

In *State in Int. of N.B.*, 52,002 (La. App. 2 Cir. 3/16/18), 248 So. 3d 532, 537, *writ denied,* 18-0617 (La. 5/25/18), 243 So. 3d 568, we explained:

> The party seeking to recuse cannot merely allege lack of impartiality; he must present some factual basis. Further, *the bias, prejudice, or personal interest alleged must be of*

20

> *a substantial nature* and based on more than conclusory allegations. (Internal citations omitted; emphasis added).

Furthermore, the inquiry is objective; proof of actual subjective bias is unnecessary:

> [T]o recuse a judge from a case, the moving party is required to prove that "objectively speaking, **'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable."** *Daurbigney v. Liberty Pers. Ins. Co.*, 18-929 (La. App. 3 Cir. 5/9/19), 272 So. 3d 69, *quoting Rippo v. Baker*, —— U.S. ——, 137 S. Ct. 905, 197 L.Ed. 2d 167 (2017). (Emphasis in original).

*Hatfield v. Herring*, 54,048 (La. App. 2 Cir. 8/11/21), 326 So. 3d 944, 953, *writ denied,* 21-01377 (La. 12/7/21), 328 So. 3d 424.

To preserve the issue of the trial court's alleged bias (or other ground for recusal) for appeal, the complaining party must raise the issue in a written motion in the trial court before judgment. Only the grounds stated in the written motion are preserved. La. C.C.P. art. 154; *Wilson v. St. Landry Par. Sch. Bd.*, 20-136 (La. App. 3 Cir. 12/23/20), 311 So. 3d 457, 464-5; *Cortes v. Lynch*, 02-1498 (La. App. 1 Cir. 5/9/03), 846 So. 2d 945, 953.

Because Sonja failed to file a timely written motion to recuse, that avenue of remedy is unavailable, and the trial judge's alleged bias is not preserved for appeal. Our review is limited to determining whether the trial judge's *conduct* (specified above) had prejudicial effect sufficient to deprive Sonja of a fair trial. We hold that there was no prejudicial effect at all, since this was a bench trial. There obviously was no risk of jury confusion. Neither is there any indication that the trial court caused the witness (Randy) to substantively alter his testimony, nor has Sonja articulated any prejudice resulting from these acts. Therefore, we must conclude that there was no prejudicial effect. *Franks, supra.* This assignment of error lacks merit.

21

**Rule 9.5/signing of judgment within 48 hours**

Sonja asserts that the trial court erred in signing the judgment only 48 hours after making an oral ruling in open court. Uniform District Court Rule 9.5(b) requires that, if a judgment is not presented for signature when rendered, but instead, is to be presented thereafter, the responsible attorney must circulate the judgment at least five days prior to presentation for signature so all parties have opportunity "for comment."

In this appeal, Sonja can, through her assignments of error, make whatever comments regarding the judgment that she wishes, and this court can rule on whatever issues she properly raises. It would be wasteful and pointless to vacate and/or remand for compliance with Rule 9.5. This assignment of error is rejected for lack of merit.

## CONCLUSION

The judgment of the trial court is **AFFIRMED** insofar as it recognizes Randy Graham's 49 percent ownership interest in the horse but is **REVERSED** and **VACATED** in: (1) granting Randy Graham a right of first refusal; and (2) setting the price at $1,500. The partition matter is **REMANDED** with instructions to appoint a notary public and an independent appraiser and otherwise conduct the partition in a manner consistent with this opinion and the Code of Civil Procedure. The denial of Sonja's reimbursement claim against Randy Graham is **AFFIRMED**. The declaration in the judgment that John Graham is a 25.5 percent owner is **AFFIRMED**. The denial of Sonja's reimbursement claim against John Graham is **REVERSED**, and the claim is **REMANDED** for further proceedings. The costs of this appeal are taxed in equal shares among all three of the parties.

22